## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALI TOORANI, derivatively on behalf of IDEANOMICS, INC., | |
| Plaintiff, | **C.A. No. 1:20-cv-05333** |
| vs. | |
| ZHENG WU a/k/a BRUNO WU, BING YANG, ROBERT G. BENYA, FEDERICO TOVAR, ALFRED POOR, CONOR MCCARTHY, JAMES S. CASSANO, HARRY EDELSON, STEVEN FADEM, JERRY FAN, SHANE MCMAHON, JIN SHI, JOHN WALLACE, CHAO YANG, and KANG ZHAO, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| IDEANOMICS, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

**INTRODUCTION**

Plaintiff Ali Toorani ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Ideanomics, Inc. ("Ideanomics" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Zheng Wu a/k/a Bruno Wu, Bing Yang, Robert G. Benya, Federico Tovar, Alfred Poor, Conor McCarthy, James S. Cassano, Harry Edelson, Steven Fadem, Jerry Fan, Shane McMahon, Jin Shi, John Wallace, Chao Yang, and Kang Zhao (collectively, the "Individual Defendants," and together with Ideanomics, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Ideanomics, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ideanomics, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Ideanomics' directors, officers, and controlling shareholder from at least February 1, 2017 to

November 13, 2018 (the "First Relevant Period") and March 20, 2020 through the present (the "Second Relevant Period").

2.      Ideanomics f/k/a Seven Stars Cloud Group, Inc. f/k/a Wecast Network, Inc.,[1] currently purports to be a global company focused on facilitating the adoption of commercial electric vehicles ("EV") and developing the next generation of financial services and financial technology ("fintech") products. The Company has long been a Company without a steady business and has frequently altered both its business name as well as its purported business operations.

3.      From 2010 through 2017, the Company's primary business activities involved providing premium video content on demand services, primarily in China, through its subsidiaries under the brand name "You-on-Demand," which was also part of the Company's operating name in 2016.

4.      In 2017, the Company pivoted its business model professedly to become a next generation fintech company and also began trading petroleum products and electronic components that, "the Company believed had significant potential to recognize benefits from blockchain and AI technologies[.]"

5.      Between February 1, 2017 and November 13, 2018, certain of the Individual Defendants caused the Company to misrepresent several aspects of its business operations and prospects, while engaging in numerous related party transactions with the Company's Chairman and CEO at the time, Zheng Wu a/k/a Bruno Wu ("Wu").  Specifically, in February 2017, the Company acquired Sun Video Group HK Limited ("SVG") and 55% of Wide Angle Group ("WAG") from BT Capital Global Limited ("BT Capital"), a private equity fund controlled by

---

[1] Throughout the Complaint, all references to "Ideanomics" or Company filings and materials encompass Ideanomics' prior corporate names.

Defendant Wu. The transaction included a $250 million revenue and $15 million gross profit guarantee from BT Capital.  The Company touted the acquisitions and the purported benefits that the transactions would guarantee for Ideanomics, maintaining that the Company was confidently positioned to achieve $280-300 million in revenues for the 2017 fiscal year, while concealing the low revenue generations of SVG and WAG and their combined losses from just a quarter before the acquisitions took place. The Company proceeded to acquire several more entities related to Defendant Wu thereafter.

6.      Although Ideanomics was nowhere near its issued revenue guidance of $280-300 million for the fiscal year ended December 31, 2017—a fact unknown to investors at the time—in January 2018, the Company announced that it had already generated $170 million in revenues for the fourth quarter from its crude oil business alone, despite those revenues being only $19 million, at most, from related parties.

7.      Unsurprisingly, investors were shocked in February 2018, when Ideanomics announced that it did not expect to exceed $144 million in revenues *for the entire fiscal year* ended December 31, 2017. On February 23, 2018, the Company issued two press releases, one announcing its new auditor, BF Borgers CPA PC ("BF Borgers"), would be auditing the Company's financial statements for the quarter and year ended December 31, 2017, and another announcing its anticipated revenues for 2017, a far cry from Ideanomics' prior guidance. The press release quoted Defendant Wu, who revealed for the first time that the Company had dismissed its CEO, who had reportedly "resigned" in October 2017, to supposedly cure "deficiencies" that "resulted in what is anticipated to be 2017 revenue that is below prior and recent guidance expectations."

8.      On this news, the Company's stock price fell approximately 39.3%, from closing at $2.80 per share on February 22, 2018, to close at $1.70 per share on February 23, 2018.

9.      After disappointing investors with much lower than anticipated revenues, the Company began emphasizing its purported application of blockchain technology and artificial intelligence ("AI") in its consumer electronics and crude oil trading businesses—allowing the Company to artificially boost its shares back up.

10.     In August 2018, in response to comments made by the SEC, the Company amended its annual report filed with the SEC on March 30, 2018 for the fiscal year ended December 31, 2017 (the "2017 10-K"), revealing, in part, that the Company generated $18.9 million in revenues, or approximately 89% less than the $170 million in revenues previously announced in January 2018, from related party transactions in its crude oil business.

11.     On this news, the Company's stock price fell approximately 18.2%, from closing at $4.95 per share on August 27, 2018, to close at $4.05 per share on August 28, 2018.

12.     During this period, the SEC also began scrutinizing companies for touting AI and blockchain technology to upgrade their stock artificially. On November 14, 2018, the Company issued a press release in which it announced that it intended on fully divesting its oil trading and consumer electronics businesses and fully shift to its "efforts on the higher margins we believe may be achievable in our digital securitized asset business." The same day, in its quarterly report filed with the SEC for the fiscal period ended September 30, 2018 (the "3Q18 10-Q"), the Company revealed that its "commodities trading business does not currently integrate blockchain or AI based logistics solutions[]" despite touting its blockchain applications in prior filings. Also the same day, the Company issued a press release announcing the suspicious temporary resignation of Defendant Wu.

13.     On this news, the Company's stock price fell approximately 48.8%, from closing at $3.26 per share on November 13, 2018, to close at $1.67 per share on November 14, 2018.

14.     The Company disposed of its consumer electronics and crude oil trading businesses in 2019 and shifted its focus once again, this time to the EV industry, which led to Ideanomics' establishment of its Mobile Energy Global ("MEG") business unit.

15.     Ideanomics currently operates in one segment with two business units, MEG and Ideanomics Capital.

16.     MEG's purported mission is to use EV and EV battery sales and financing to attract fleet operators that Ideanomics asserts will generate large scale demand for energy, systems, and contracts. Ideanomics receives fees for completed transactions and serves as a middleman and financier between commercial fleet operators and EV manufacturers. MEG operates through a series of joint ventures, mainly located in China. The Company has offices in New York, Beijing, and Qingdao, China.

17.     Beginning in March 2020, the Company began touting its "one million square foot EV expo center in Qingdao, Shandong Province," known as the Company's MEG division or the "MEG Center" in press releases. The Company boasted that the MEG Center is "the largest auto trading market in Qingdao[.]" The Company launched operations at the MEG Center in May 2020.

18.     On June 25, 2020, short analyst Hindenburg Research ("Hindenburg") challenged the Company's supposed operations in its MEG Center as well as its dubious business pivots in a series of tweets, asserting that the Company was, "an egregious & obvious fraud[.]" Hidenburg contended that the Company had a "history of changing biz models and pumping – then dumping – each new endeavor. Its move to EVs will be no different." Hidenburg pointed to a recent press release issued by the Company, stating that Ideanomics had doctored the photo, which Hidenburg

claimed had been taken and published in 2018—well before Ideanomics' MEG Center soft launch in May 2020.

19.     The same day, another analyst, J Capital Research published a critical report about Ideanomics titled, "Champion of Promotes" (the "JCAP Report"), which labeled the Company "as zero" and maintained that, "[t]he company changes its name and promotional story so frequently that it's hard to keep up. One thing remains a constant, despite all the press releases, buzzwords and hype: shareholders get wiped out." The JCAP Report also stated investigators were not able to establish the Company's MEG Center operations in Qingdao, which purportedly began in May 2020. J Capital Research asserted that staff from a majority of the organizations the Company touted business deals with had no deal with the Company, stating in relevant part in a related tweet that, "[w]e called all the 'buyers' named in [Ideanomics'] press releases this month. Not a single one had made a purchase. One of them thanked us for alerting them to 'fake news.'"

20.     The JCAP Report also casted doubt on the capabilities of Ideanomics' auditor, BF Borgers, based on its reputation with the Public Accounting Oversight Board ("PCAOB").

21.     On this news, the Company's stock price fell approximately 21%, from closing at $3.09 per share on June 24, 2020, to close at $2.44 per share on June 25, 2020.

22.     The next day, on June 26, 2020, the Company issued a press release addressing its MEG Center to "clarify the status" of its EV hub in Qingdao. This press release, contrary to Ideanomics' prior press releases, stated that the Company's supposed 1 million square feet MEG Center was to launch in three phases—that would *ultimately* reach 1 million square feet. The press release revealed that the MEG Center was merely in the first phase of its launch and only occupied 215,000 square feet.

23.     On this news, the Company's stock price declined further from closing at $2.44 per share on June 25, 2020, to close at $1.46 per share on June 26, 2020, representing a total drop of approximately 53% over a two-day period.

24.     During the First Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company was not positioned to meet its 2017 guidance of $280-300 million; (2) the financial performances of SVG and WAG, including their undisclosed revenues and combined losses made their profitability for Ideanomics highly unlikely; (3) the Company's crude oil business only provided Ideanomics with $19 million in revenue for the fourth quarter of 2017, despite representations that it provided $170 million during that period; (4) the Company thus had no reasonable basis for its 2017 guidance; (6) as it touted its consumer electronics business and crude oil business, Ideanomics represented it had been integrating AI and blockchain technology into those businesses, when it had not and did not intend to do so, and blockchain was thus not driving the Company's revenues; and (7) the Company had been operating its crude oil and consumer electronics business for "research purposes" rather than for competitive returns.  As a result of the foregoing, the Company's public statements during the First Relevant Period were materially false and misleading.

25.     During the Second Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading promotional statements regarding the Company's

business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia,* that: (1) the MEG Center situated in Qingdao, China was not in fact a "one million square foot EV expo center"; (2) as part of its promotional efforts, the Company utilized doctored photographs of the purported MEG Center in its press releases; (3) Ideanomics overplayed the strength of its EV business operations in China; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements in the Second Relevant Period were materially false and misleading.

26.     During the First Relevant Period and the Second Relevant Period, the Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

27.     The Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

28.     In light of the Individual Defendants' misconduct, which has subjected Ideanomics, its Chairman of the Board of Directors ("Board"), former Chief Executive Officer ("CEO"), former President and Chief Revenue Officer ("CRO"), and former Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit filed in the United States District Court for the Southern District of New York (the "First Class Action"), and the Company, its Chairman, current CEO, and CFO, to being named defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of New York (the "Second Class Actions," and together with the First Class Action, the "Securities Class Actions"), the need to undertake internal investigations, the need to implement

adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

29.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the current CEO's liability in the Second Class Actions, and the Chairman's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of Ideanomics' Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

31.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

32.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

33.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

34.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

35.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

36.     Venue is proper in this District because Ideanomics and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

37.     Plaintiff is a current shareholder of Ideanomics common stock and has continuously held Ideanomics common stock at all relevant times.

### Nominal Defendant Ideanomics

38.     Ideanomics is a Nevada corporation with its principal executive offices at 55 Broadway, 19th Floor, New York, New York 10006. Ideanomics' shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "IDEX."

### Defendant Wu

39.     Defendant Wu is the "founder" of Ideanomics and has served as Ideanomics' Chairman since January 2016, except for a brief three-month period where he temporarily stepped down from his position. Defendant Wu also served as the Company's CEO from October 2017 through November 2018. As CEO, Defendant Wu also beneficially owned 46.2% of combined

common stock and Series A stock of the Company, rendering him a controlling shareholder.[2]

Indeed, during the First Relevant Period, the Company acquired several affiliates of Defendant

Wu's. According to the Company's Schedule 14A filed with the SEC on December 13, 2019 (the

"2019 Proxy Statement"), as of November 15, 2019, Defendant Wu beneficially owned 24,394,044

shares of the Company's common stock and 7,000,000 of Series A Preferred Stock, which

represented 25.1% of combined common stock and Series A stock of the Company. Given that the

price per share of the Company's common stock at the close of trading on November 15, 2019 was

$0.70, Defendant Wu owned approximately $17 million worth of Ideanomics common stock, not

including his Series A Preferred Stock ownership.

40.    For the fiscal year ended December 31, 2018, Defendant Wu received $852,832 in

compensation from the Company. This included $312,500 in salary, $125,000 in bonus, and

$415,332 in stock awards.

41.    The Company's 2019 Proxy Statement stated the following about Defendant Wu:

*Bruno Wu*

Director Since: January 2016 Age: 53

Dr. Wu has served as our Chairman since January 12, 2016. Dr. Wu is the founder,
co-chairman and CEO of Sun Seven Stars Media Group Limited, a private media
and investment company in China, since 2007. Its predecessor is Sun Media Group
Holdings Limited, which was established by Dr. Wu and his spouse in 1999. Dr.
Wu served as chairman of Sun Media Group from 1999 to 2007 and was former
director of Shanda Group, a private investment group, from 2006 to 2009 and as
former co-chairman of Sina Corporation (NASDAQ: SINA), a Chinese media and
Internet services company, from 2001 to 2002. Additionally, Dr. Wu served as the
chief operating officer for ATV, a free-to-air television broadcaster in Hong Kong,
from 1998 to 1999. Dr. Wu served as a director of Seven Star Works Co Ltd
(KOSDAQ:121800) between 2015 to 2017, and served as a director of Semir
Garment Co. Ltd (SHE:00256) between 2008 and 2012. Dr. Wu received a Ph.D.
from the School of International Relations and Public Affairs at Fudan University
in 2001 and prior to that received an M.A. in International Relations from

---

[2] *See* Schedule 14A filed with the SEC on November 20, 2017 (the "2017 Proxy Statement"). Each Series
A Preferred Stock is convertible into 0.1333333 shares of common stock.

Washington University, a B.A. in Business Management from Culver-Stockton College of Missouri and a diploma in Superior Studies in French Literature from the School of French Language and Literature at the University of Savoie in Chambery, France.

**Defendant Bing**

42. Defendant Bing Yang ("Bing") served as CEO and as a director of Ideanomics from December 2016 until he was terminated in October 2017.

43. For the fiscal year ended December 31, 2017, Defendant Bing received $484,386 in compensation from the Company. This included $221,386 in cash compensation and $263,000 in stock awards.

44. The Company's 2017 Proxy Statement stated the following about Defendant Bing:

***Bing Yang***

On March 28, 2016, we entered into an employment agreement with Mr. Yang effective as of April 26, 2016. Mr. Yang's employment agreement has an initial term of two years, with automatic one–year extensions thereafter unless written notice of nonrenewal is given by either party not less than 90 days prior to the end of the then current term. Mr. Yang will be paid an initial base salary of $180,000 per year, which will be subject to annual review by the CEO and Compensation Committee of the Board and may be adjusted. Mr. Yang will also receive a one–time sign–on bonus of $20,000 In addition, so long as he remains employed and achieves annual performance objectives, Mr. Yang is entitled to receive 100,000 shares of restricted stock per year under the Company's 2010 Equity Incentive Plan to be issued in April 2016, and each quarter after April 2016 till April 2018. Mr. Yang will also be entitled to participate in all employee benefit plans, policies practices of the Company generally available to any of its senior executive employees. On March 28, 2017, the Board of Directors approved an increase in Mr. Yang's base salary to $220,000 to reflect his new position as CEO. Effective as of October 9, 2017, Mr. Yang announced his resignation as CEO and director of the Company's Board of Directors. Mr. Yang's resignation as CEO and director of the Board was not because of any disagreement with the Company known to an executive officer of the Company on any matter related to the Company's operations, policies, or practices. Mr. Yang will resign from both the CEO and director positions immediately, but will remain with the Company in an advisory role until the end of 2017.

**Defendant Benya**

45.     Defendant Robert G. Benya ("Benya") served as the Company's President, director and as CRO from October 2017 until he resigned in November 2018.

46.     For the fiscal year ended December 31, 2017, Defendant Benya received $40,000 in cash compensation from the Company.

47.     The Company's 2017 Proxy Statement stated the following about Defendant Benya:

**Robert G. Benya**

Director Since: October 2017 Age: 58

Mr. Benya was appointed as Chief Revenue Officer and director of the Company effective as of October 9, 2017. Mr. Benya is a highly distinguished media executive with over 35 years of experience who has pioneered numerous businesses and product innovations in the U.S. and Scandinavian cable television industries. Prior to joining the Company, from January 2010 to June 2017, he was the President & CEO of iN DEMAND L.L.C., the pioneer & world leader in providing transactional entertainment through TV's most innovative technologies. Prior to joining iN DEMAND, Mr. Benya led numerous innovations at Time Warner Cable ("TWC") and helped create new, multi-billion dollar businesses including: Road Runner High Speed Internet, Broadband Portals, Online Video Stores, Advertising Sales Interconnect Joint Ventures, Pay Per View, Video on Demand, Interactive TV and Cloud DVR services. During his career he was the Chief Revenue Officer for Road Runner High Speed Internet, Senior Vice President of AOL/Time Warner Interactive Video and Corporate Senior Vice President for Time Warner Cable (TWC). Mr. Benya has received numerous industry awards including the Cable TV Vanguard Award, multiple ACE and CTAM Awards, two Marketing Executive of the Year Awards, the Paragon Communication President's Award and a Time Warner Cable Innovation Award. He also holds six patents and has won a Technical Emmy Award.

Mr. Benya has significant operational, revenue and executive management experience in the content content distribution and, cloud services space and has significant experience serving in senior executive positions, including chief revenue officer. In light of our business and structure, Mr. Benya's extensive industry and management experience led us to the conclusion that he should serve as a director of our Company.

**<u>Defendant Tovar</u>**

48. Defendant Federico Tovar ("Tovar") served as the Company's CFO from June 2018 until he resigned in April 2019. According to the 2019 Proxy Statement, as of November 15, 2019, Defendant Tovar beneficially owned 60,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 15, 2019 was $0.70, Defendant Tovar owned approximately $42,000 worth of Ideanomics stock.

49. For the fiscal year ended December 31, 2018, Defendant Tovar received $326,867 in compensation from the Company. This included $116,667 in salary, $65,000 in bonus, and $145,200 in stock awards.

50. The Company's Schedule 14A filed with the SEC on December 14, 2018 (the "2018 Proxy Statement") stated the following about Defendant Tovar:

> **Mr. Federico Tovar.** Our Chief Financial Officer is a seasoned business professional and subject matter expert in AI, fintech, blockchain, IoT and cybersecurity. He was previously the Chief Financial and Strategy Officer of Global Data Sentinel Inc, a privately held and high growth cybersecurity and AI technology company that supports data security across domains, including network, cloud, mobile and IoT, with AI capabilities and next-generation applications in fintech, blockchain, energy, insurance, healthcare, and media industries, amongst others. Mr. Tovar has developed strategic plans and business models, structured various IP and technology licensing deals, closed on various M&A transactions and debt and equity financing rounds, and formulated corporate growth and financial strategies for technology companies which have resulted in measurable execution strategies.

**Defendant Poor**

51. Defendant Alfred Poor ("Poor") has served as Ideanomics' CEO since February 2019 and as a Company director since December 2018. Defendant Poor also served as Chief Operating Officer ("COO") and President of the Connecticut Fintech Village. According to the 2019 Proxy Statement, as of November 15, 2019, Defendant Poor beneficially owned 1,000,000 shares of the Company's common stock with underlying options exercisable within 60 days at $1.92. Given that the price per share of the Company's common stock at the close of trading on

November 15, 2019 was $0.70, Defendant Poor owned approximately $700,000 worth of Ideanomics stock, at least.

52.     Pursuant to Defendant Poor's employment agreement, effective February 15, 2019, Defendant Poor will receive an annual base salary of $300,000. If the Company achieves two consecutive quarters in profits from operations, the base salary shall immediately be raised to $400,000.  Mr. Poor will be entitled to stock options up to 2,000,000 shares.

53.     The Company's 2019 Proxy Statement stated the following about Defendant Poor:

**Alfred Poor.** Our Chief Executive Officer and President of the Connecticut Fintech Village is a former Chief Operating Officer at Global Data Sentinel, a cybersecurity company that specializes in identity management, file access control, protected sharing, reporting and tracking, AI and thread response, and backup and recovery. He is the former President and Chief Operating Officer of Agendize Services Inc., a company with an integrated suite of applications that help businesses generate higher quality leads, improve business efficiency and customer engagement. Mr. Poor is a client-focused and profitability-driven management executive with a track record of success at both rapidly-growing technology companies and large, multi-national, organizations.

**<u>Defendant McCarthy</u>**

54.     Defendant Conor McCarthy ("McCarthy") has served as the Company's CFO since September 2019. According to the 2019 Proxy Statement, as of November 15, 2019, Defendant McCarthy beneficially owned 125,000 shares of the Company's common stock with underlying options exercisable within 60 days at $1.97. Given that the price per share of the Company's common stock at the close of trading on November 15, 2019 was $0.70, Defendant McCarthy owned approximately $87,500 worth of Ideanomics stock, at least.

55.     The Company's 2019 Proxy Statement stated the following about Defendant McCarthy:

**Conor McCarthy**. Our Chief Financial Officer has over 30 years of experience as a Chief Financial Officer in areas such as corporate strategy and corporate finance including capital raising and M&A. Mr. McCarthy most recently served as the

Chief Financial Officer of OS33, a private equity backed FinTech SaaS platform for compliance and productivity enablement for the wealth management industry with 200 employees, from July 2018 to May 2019. Prior to that, Mr. McCarthy served as the (i) Chief Financial Officer of Intent from May 2016 to July 2018; (ii) the Chief Financial Officer of Convergex Group from June 2014 to July 2015 and (iii) the Chief Financial Officer and Finance Director of the Americas for GFI Group, Inc., a NYSE-listed fintech wholesale money broker with revenues of almost $1Billion (now part of BGC Partners, Nasdaq: BGCP), from March 2005 to June 2014. Mr. McCarthy, holds a CA from the Institute of Chartered Accountants in Ireland. Mr. McCarthy started his career as an auditor with KPMG in Ireland. Mr. McCarthy then transitioned into financial services, working as CFO, Treasurer, and in other executive finance roles, with trading and brokerage firms, as well as high growth fintech partners supporting the financial services industry.

**Defendant Cassano**

56.     Defendant James Cassano ("Cassano") has served as a Company director since January 2008. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of November 15, 2019, Defendant Cassano beneficially owned 258,993 shares of the Company's common stock.[3] Given that the price per share of the Company's common stock at the close of trading on November 15, 2019 was $0.70, Defendant Cassano owned approximately $93,774 worth of Ideanomics stock, at least.

57.     For the fiscal year ended December 31, 2017, Defendant Cassano received $339,354 in compensation from the Company. This included $20,250 in fees earned or paid in cash, $25,000 in stock awards, and $294,104 in option awards.  For the fiscal year ended December 31, 2018, Defendant Cassano received $202,800 in compensation from the Company. This included $46,800 in fees earned or paid in cash, and $156,000 in stock awards.

---

[3] These shares included (i) 133,963 shares of Common Stock, (ii)13,333 shares underlying options exercisable within 60 days at $2.00 per share, (iii) 8,974 shares underlying options exercisable within 60 days at $2.91 per share, (iv)75,800 shares underlying options exercisable within 60 days at $5.57 and (v) 26,923 vested restricted shares units.

58.     The Company's 2019 Proxy Statement stated the following about Defendant Cassano:

*James S. Cassano\**

Director Since: January 2008 Age: 73

Mr. Cassano was appointed as director of the Company effective as of January 11, 2008. Mr. Cassano is currently a Partner & Chief Financial Officer of CoActive Health Solutions, LLC, a worldwide contract research organization, supporting the pharmaceutical and biotechnology industries. Mr. Cassano has served as executive vice president, chief financial officer, secretary and director of Jaguar Acquisition Corporation a Delaware corporation (OTCBB: JGAC), a blank check company, since its formation in June 2005. Mr. Cassano has served as a managing director of Katalyst LLC, a company which provides certain administrative services to Jaguar Acquisition Corporation, since January 2005. In June 1998, Mr. Cassano founded New Forum Publishers, an electronic publisher of educational material for secondary schools, and served as its chairman of the Board and chief executive officer until it was sold to Apex Learning, Inc., a company controlled by Warburg Pincus, in August 2003. He remained with Apex until November 2003 in transition as vice president business development and served as a consultant to the company through February 2004. In June 1995, Mr. Cassano co-founded Advantix, Inc., a high volume electronic ticketing software and transaction services company which handled event related client and customer payments, that was renamed Tickets.com and went public through an IPO in 1999. From March 1987 to June 1995, Mr. Cassano served as senior vice president and chief financial officer of the Hill Group, Inc., a privately-held engineering and consulting organization, and from February 1986 to March 1987, Mr. Cassano served as vice president of investments and acquisitions for Safeguard Scientifics, Inc., a public venture development company. From May 1973 to February 1986, Mr. Cassano served as partner and director of strategic management services (Europe) for the strategic management group of Hay Associates. Mr. Cassano received a B.S. in Aeronautics and Astronautics from Purdue University and an M.B.A. from Wharton Graduate School at the University of Pennsylvania.

Mr. Cassano has significant senior management experience, including service as chief executive officer, executive vice president, chief financial officer, secretary and director. In light of our business and structure, Mr. Cassano's extensive executive experience and his educational background led us to the conclusion that he should serve as a director of our Company.

**Defendant Edelson**

59.     Defendant Harry Edelson ("Edelson") has served as a Company director since September 2019. He also serves as the Chair of the Governance and Nominating Committee.

60.     The Company's 2019 Proxy Statement stated the following about Defendant Edelson:

*Harry Edelson**

Director Since: September 2019 Age: 86

Mr. Edelson was appointed as director of the Company effective as of September 15, 2019, CFA, CCP, CDP, is the Founder of Edelson Technology Partners, and President since 1980 of Edelson Technology, Inc., a company involved in consulting, fundraising, M&A, and investments. From 1984 until 2005 Mr. Edelson was an advisor and consultant for 10 multinational corporations (AT&T, Viacom, 3M, Ford Motor, Cincinnati Bell, Colgate-Palmolive, Reed Elsevier, Imation, Asea Brown Boveri and UPS). During this time he managed four technology-oriented strategic venture capital funds for the aforementioned 10 companies using corporate rather than pension money. He has served on over 150 boards of directors, 12 as chairman. At some time in the past five years, Harry Edelson served as a director of four private companies, Airwire, PogoTec, eChinaCash, Pathway Genomics, and one public company, China Gerui. Executive positions in industry include Senior Systems Computer Engineer for Unisys, Transmission Engineer for AT&T (1962-1967), CTO for Cities Service (1967-1970) and Director of Marketing for a terminal manufacturer serving the nascent internet industry (1971-1973). His experience in technology led him to a 12 year career as a securities analyst on Wall Street covering telecommunications, computers, and office equipment for three leading investment banking firms in the 1970s and 1980s. Harry obtained a BS in Physics from Brooklyn College in 1962, MBA from New York University Graduate School of Business in 1965, and completed a Graduate Program in Telecommunications Engineering at the Cornell Graduate School of Electrical Engineering in 1966. In 2007, Harry served as Chairman and Chief Executive Officer for China Opportunity Acquisition Corp., a SPAC that raised $40 million and merged with China Gerui in 2009. Mr. Edelson was a Council member of The Julliard School of Music Dance & Drama, and is the founder and still Chairman of the China Investment Group; and the founder and current member of the Chinese Cultural Foundation. Harry's qualifications to serve as a director include decades of experience on Wall Street and various venture capital ventures. He has SPAC experience, vast board experience, and participated in numerous M&A transactions.

## **Defendant Fadem**

61.     Defendant Steven Fadem ("Fadem") has served as a Company director since August 2019. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee and Governance and Nominating Committee.

62.     The Company's 2019 Proxy Statement stated the following about Defendant Fadem:

*Steven Fadem\**

Director Since: August 2019 Age: 68

Mr. Fadem was appointed as director of the Company effective as of August 14, 2019. He is an innovative executive and thought leader with substantial experience building media, entertainment, technology, information services, big data and cybersecurity companies with experience in the digital transformation of traditional businesses. Mr. Fadem has successfully launched start-ups; turned-around and revitalized complex corporate businesses and created long-term-value for professional services organizations. Mr. Fadem was the Chairman of Global Data Sentinel, a cybersecurity firm he co-founded in 2014. In his capacity as Chairman, he has led the company's strategic development and client acquisition efforts. Previously, Mr. Fadem ran several private equity-backed companies in media, energy, information services and financial services; the business side of a top-five Am Law firm, Kirkland & Ellis; and a major financial services firm, Geller & Co. which, among other things, possesses a major multifamily office servicing the ultra-high net worth community and is the outsourced CFO for Bloomberg L.P. Mr. Fadem received his JD from Emory University School of Law and a B.S. in Economics from the Wharton School of the University of Pennsylvania .

**Defendant Fan**

63.     Defendant Jerry Fan ("Fan") has served as a Company director since January 2016. He also serves as a member of the Audit Committee and the Governance and Nominating Committee. According to the 2019 Proxy Statement, as of November 15, 2019, Defendant Fan beneficially owned 159,569 shares of the Company's common stock.[4] Given that the price per share of the Company's common stock at the close of trading on November 15, 2019 was $0.70, Defendant Fan owned approximately $58,638 worth of Ideanomics stock, at least.

---

[4] These shares included: (i) 83,769 shares of Common Stock, (ii)75,800 shares underlying options exercisable within 60 days at $5.57 and (iii) vested 26,923 restricted shares units.

64.    For the fiscal year ended December 31, 2017, Defendant Fan received $339,354 in compensation from the Company. This included $20,250 in fees earned or paid in cash, $25,000 in stock awards, and $294,104 in option awards.  For the fiscal year ended December 31, 2018, Defendant Fan received $202,800 in compensation from the Company. This included $46,800 in fees earned or paid in cash, and $156,000 in stock awards.

65.    The Company's 2019 Proxy Statement stated the following about Defendant Fan:

*Jerry Fan**

Director Since: January 2016 Age: 52

Mr. Fan was appointed as director of the Company on January 12, 2016. Mr. Fan has served as Managing Director and Country Manager for the Greater China region at Analog Devices, Inc. (NASDAQ: ADI), a global semiconductor company since November, 2012. Prior to ADI, Mr. Fan worked for Cisco Systems, Inc. (NASDAQ: CSCO) for 15 years between 1997 and 2012 in a number of senior management roles, including Sales Managing Director for Cisco China, Sale Director for Cisco Australia and Senior Manager for Operations and Strategy for the Cisco Service Provider business based in Hong Kong. Mr. Fan started his career in 1998 working at Fudan University as a faculty member in both teaching and research roles. He graduated from Fudan University with a Computer Science Bachelor degree and an Executive MBA degree from CEIBS (China European International Business School) in 1999.

Mr. Fan has more than 20 years of experience in top management positions in China and the Asia Pacific region, working for several multinational technology companies. He also has served in senior management positions of several U.S. public companies. In light of our business and structure, Mr. Fan's extensive industry and business experience and his educational background led us to the conclusion that he should serve as a director of our Company.

**Defendant McMahon**

66.    Defendant Shane McMahon ("McMahon") has served as a Company director since July 2010. He has also served as Vice Chairman since January 2016. Defendant McMahon also served as the Company's CEO in 2012, during which time he made a $3 million loan to the Company in consideration for a convertible note in the aggregate principal amount of $3 million at an annual interest rate of 4%. The Company has executed several amendments to extend the

maturity date of the note due to McMahon, most recently to December 31, 2020. According to the 2019 Proxy Statement, as of November 15, 2019, Defendant McMahon beneficially owned 6,090,589 shares of the Company's common stock,[5] which represented 4.5% of combined common stock and Series A stock of the Company. Given that the price per share of the Company's common stock at the close of trading on November 15, 2019 was $0.70, Defendant McMahon owned approximately $2.1 million worth of Ideanomics stock, at least.

67.    For the fiscal year ended December 31, 2017, Defendant McMahon received $339,354 in compensation from the Company. This included $20,250 in fees earned or paid in cash, $25,000 in stock awards, and $294,104 in option awards.

68.    The Company's 2019 Proxy Statement stated the following about Defendant McMahon:

*Shane McMahon\**

Director Since: July 2010 Age: 48

Mr. McMahon was appointed Vice Chairman as of January 12, 2016 and was previously our Chairman from July 2010 to January 2016. Prior to joining us, from 2000 to December 31, 2009, Mr. McMahon served in various executive level positions with World Wrestling Entertainment, Inc. (NYSE: WWE). Mr. McMahon also sits on the Boards of Directors of International Sports Management (USA) Inc., a Delaware corporation, and Global Power of Literacy, a New York not-for-profit corporation.

---

[5] These shares included: (i) 3,081,462 shares of Common Stock, (ii) 533,333 shares of Common Stock underlying options exercisable within 60 days at $3.00 per share, (iii) 40,000 shares of Common Stock underlying options exercisable within 60 days at $4.50 per share; (iv) 166,666 shares of Common Stock underlying options exercisable within 60 days at $2.00 per share, (v) 75,800 shares of Common Stock underlying options exercisable within 60 days at $5.57 per share, and (vi) 91,411 vested restricted shares units. In addition, Mr. McMahon's shares of Common Stock includes 2,101,917 shares of Common Stock, issuable within 60 days, upon conversion of a promissory note which is convertible into Common Stock at a conversion price of $1.50, until December 31, 2019.

Mr. McMahon has significant marketing and promotion experience and has been instrumental in exploiting content programming on a global basis. In light of our business and structure, Mr. McMahon's extensive executive and industry experience led us to the conclusion that he should serve as a director of our Company.

**Defendant Shi**

69. Defendant Jin Shi ("Shi") served as a Company director from February 2014 until April 2019.

70. For the fiscal year ended December 31, 2017, Defendant Shi received $339,354 in compensation from the Company. This included $20,250 in fees earned or paid in cash, $25,000 in stock awards, and $294,104 in option awards.  For the fiscal year ended December 31, 2018, Defendant Shi received $202,800 in compensation from the Company. This included $46,800 in fees earned or paid in cash, and $156,000 in stock awards.

71. The Company's 2018 Proxy Statement stated the following about Defendant Shi:

***Jin Shi****

Director Since: February 2014 Age: 48

Mr. Shi was appointed as director of the Company in February 2014. Mr. Shi has been a managing partner of Chum Capital Group Limited since 2007, a merchant banking firm that invests in Chinese growth companies and advises them on financings, mergers & acquisitions and restructurings. From 2011 through 2013, Mr. Shi served as the chief executive officer and a director on the board of China Growth Equity Investment Limited, which acquired Pingtan Marine Enterprise Limited in February 2013. From 2010 through 2011, he served as the vice-chairman and a director of the board of China Growth Equity Investment Limited. From 2006 through 2009, Mr. Shi served as the chief executive officer and a director of the board of ChinaGrowth North Acquisition Corporation, which acquired UIB Group Limited in January 2009, the second largest insurance brokerage firm in China. From 2006 through 2009, Mr. Shi also served as the chief financial officer and a director of the board of ChinaGrowth South Acquisition Corporation, which acquired Olympia Media Holdings Ltd. in January 2009, the largest privately-owned newspaper aggregator and operator in China. Mr. Shi has also been the chairman of Shanghai RayChem Industries Co., Ltd., a research & development based active pharmaceutical ingredient producer, since he founded the company in 2005. Mr. Shi is also the president of PharmaSource Inc., a company he founded in

1997. Mr. Shi received an EMBA from Guanghua School of Management, Peking University and a BS degree in Chemical Engineering from Tianjin University.

Mr. Shi provides our Board with significant executive-level leadership expertise as well as extensive experience as a director of various companies. In light of our business and structure, Mr. Shi's business experience and education background led us to the conclusion that he should serve as a director of our Company.

### Defendant Wallace

72.     Defendant John Wallace ("Wallace") has served as a Company director since July 2019. According to the 2019 Proxy Statement, as of November 15, 2019, Defendant Wallace beneficially owned 340,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 15, 2019 was $0.70, Defendant Wallace owned approximately $238,000 worth of Ideanomics stock.

73.     The Company's 2019 Proxy Statement stated the following about Defendant Wallace:

*John Wallace\**

Director Since: July 2019 Age: 69

Mr. Wallace was appointed as director of the Company effective as of July 2019. Mr. Wallace is a seasoned executive with experience across a range of industries. For the majority of his career, John was a senior executive & officer of the Philadelphia Stock Exchange ("PHLX"). John started at the PHLX in 1964 and became a member of the PHLX in 1971. John served as a member of the PHLX Board of Governors from 1984 until August 2008. During his tenure at the PHLX John held several senior positions including Chairman, Vice Chairman and Chief Executive Officer. He traded on all floors of the exchange in the capacity of a specialist/market maker on the options and equity floors, and as a floor broker for equities, options, and currencies. In addition to his service as Chairman of the PHLX Options Committee and member of the PHLX Executive Committee, John served on virtually every PHLX Committee and chaired the following PHLX committees: Admissions, Allocation, Arbitration, Elections, Evaluation and Securities, Finance, Long Range Strategic Planning, Marketing, New Product Development and Nominating. John also served as Chairman of the Board of the Stock Clearing Corporation of Philadelphia, Chairman of the Board of the Philadelphia Board of Trade, Chairman of the Board of the Philadelphia Depository Corporation and as a board member of the PHLX's technology subsidiary, and Advanced Tech Source Company. Over the course of his career in

the securities industry, John has also been a member of the Toronto Stock Exchange, a seat owner of the New York Mercantile Exchange as well as registered with the National Futures Association as a floor broker.

**Defendant Yang**

74.    Defendant Chao Yang ("Yang") has served as a Company director since August 2018. According to the 2019 Proxy Statement, as of November 15, 2019, Defendant Yang beneficially owned 26,923 shares of the Company's common stock, consisting entirely of vested restricted share units.

75.    For the fiscal year ended December 31, 2018, Defendant Yang received $156,000 in stock awards as compensation from the Company.

76.    The Company's 2019 Proxy Statement stated the following about Defendant Yang:

*Chao Yang\**

Director Since: August 2018 Age: 68

Mr Yang was appointed as a director of the Company on August 7, 2018. Mr. Yang has been an Independent Non-Executive Director of Fosun International Limited since December 2014. Mr. Yang was the chairman of China Life Insurance Company Limited (listed on the Hong Kong Stock Exchange with stock code: 02628) from July 2005 to June 2011, the president and secretary of party committee of China Life Insurance (Group) Company from May 2005 to May 2011 and an independent non-executive director of SRE Group Limited (listed on the Hong Kong Stock Exchange with stock code: 01207) from November 2013 to December 2015. As at 31 December 2017, Mr. Yang has been a member of the 12th National Committee of the Chinese People's Political Consultative Conference and its Social and Legislative Committee. Mr. Yang, a Senior Economist, has more than 40 years of experience in the insurance and banking industries, and was awarded special allowance by the State Council. Mr. Yang graduated from Shanghai International Studies University and Middlesex University in the United Kingdom, majoring in English and business administration respectively, and received a master's degree in business administration.

Mr. Yang has significant senior management experience, including service as chairman, president and director. In light of our business and structure, Mr. Yang's extensive executive experience and his educational background led us to the conclusion that he should serve as a director of our Company.

**Defendant Zhao**

77.     Defendant Kang Zhao ("Zhao") served as a Company director from January 2018 until late 2019, upon information and belief, when he transitioned into a management position with the Company.[6] According to the 2019 Proxy Statement, as of November 15, 2019, Defendant Zhao beneficially owned 86,923 shares of the Company's common stock, consisting of 60,000 shares of common stock and 26,923 vested restricted share units. Given that the price per share of the Company's common stock at the close of trading on November 15, 2019 was $0.70, Defendant Zhao owned approximately $42,000 worth of Ideanomics stock, at least.

78.     For the fiscal year ended December 31, 2018, Defendant Zhao received $156,000 in stock awards as compensation from the Company.

79.     The Company's 2018 Proxy Statement stated the following about Defendant Zhao:

*Kang Zhao\**

Director Since: January 2018 Age: 36

**Kang Zhao.** Mr. Zhao was appointed as director of the Company on January 10, 2018. Mr. Zhao currently serves as General Manager in Yunnan Energy Investment (Shanghai) Energy Development Co., Ltd, since December 2016. Prior to that, he was Vice President in Shanghai Gaoqiao Cable Group Co., Ltd, responsible for operations and supervising around 200 employees. Mr. Zhao was nominated by Hong Kong Guo Yuan Group Capital Holdings Limited, with which the Company signed the Securities Purchase Agreement on October 23, 2017 and entitled to designate one individual to join the Board. Mr. Zhao received his MBA from Shanghai University of Finance and Economics and a BA in Economics.

Mr. Zhao has significant senior management experience, including service as general manager. In light of our business and structure, Mr. Yang's extensive executive experience and his educational background led us to the conclusion that he should serve as a director of our Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

80.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Ideanomics and because of their ability to control the business and corporate affairs

---

[6] https://news.futunn.com/stock/8908561?src=3. Last visited July 7, 2020.

of Ideanomics, the Individual Defendants owed Ideanomics and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ideanomics in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ideanomics and its shareholders so as to benefit all shareholders equally.

81.     Each controlling shareholder, director and officer of the Company owes to Ideanomics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

82.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors and/or officers of Ideanomics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

83.     To discharge their duties, the controlling shareholder, the officers and directors of Ideanomics were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

84.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ideanomics, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been

aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Ideanomics' Board at all relevant times.

85.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants, including Defendant Wu as a controlling shareholder, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

86.     To discharge their duties, the officers and directors of Ideanomics were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Ideanomics were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, New York, and the United States, and pursuant to Ideanomics' own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Ideanomics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Ideanomics and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ideanomics' operations would comply with all applicable laws and Ideanomics' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

87.     Each of the Individual Defendants further owed to Ideanomics and the shareholders the duty of loyalty requiring that each favor Ideanomics' interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

88.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Ideanomics and were at all times acting within the course and scope of such agency.

89.     Because of their advisory, executive, managerial, and directorial, and controlling shareholder positions with Ideanomics, each of the Individual Defendants had access to adverse, non-public information about the Company.

90.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ideanomics.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

91.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

92.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

93.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and

individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Ideanomics, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

94.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

95.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ideanomics and was at all times acting within the course and scope of such agency.

## IDEANOMICS' CODE OF CONDUCT

96.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct") states that:

> All the Company's employees, agents, contractors, consultants, officers and members ("Directors") of our Board of Directors (the "Board") are expected to read and understand the Code, uphold these standards in day-to-day activities, comply with all applicable policies and procedures, and ensure that all employees, agents, contractors, consultants, officers and Directors are aware of, understand and adhere to these standards.

97.     The Code of Conduct provides that "[a]ll Company employees, agents, contractors, officers and Directors must comply with all applicable laws, regulations, rules and regulatory orders. Company employees, agents, contractors, consultants, officers and Directors located

outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States[.]"

98.     Under a section titled, "Personal Conflicts of Interest," the Code of Conduct states that "we avoid situations where a conflict of interest might occur or appear to occur. The Company is subject to scrutiny from many different individuals and organizations. We should always strive to avoid even the appearance of impropriety." The Code of Conduct outlined potential personal conflicts of interest as including:

> **(i)      Employment/Outside Employment.** In consideration of your employment with the Company, you are expected to devote your full attention to the business interests of the Company. You are prohibited from engaging in any activity that interferes with your performance or responsibilities to the Company or is otherwise in conflict with or prejudicial to the Company. Our policies prohibit any employee from accepting simultaneous employment with a Company supplier, customer, developer or competitor, or from taking part in any activity that enhances or supports a competitor's position. Additionally, you must disclose to the Company any interest that you have that may conflict with the business of the Company. If you have any questions on this requirement, you should contact your supervisor or Management.

> **(ii)     Outside Directorships.** It is a conflict of interest, unless otherwise authorized by the Board, to serve as a Director of any company that competes with the Company. Although you may serve as a Director of a Company supplier, customer, developer, or other business partner, our policy requires that you first obtain approval from Management before accepting a Directorship. Any compensation you receive should be commensurate to your responsibilities. Such approval may be conditioned upon the completion of specified actions.

> **(iii)    Business Interests.** If you are considering investing in a Company customer, supplier, developer or competitor, you must first take great care to ensure that these investments do not compromise your responsibilities to the Company. Many factors should be considered in determining whether a conflict exists, including the size and nature of the investment; your ability to influence the Company's decisions; your access to confidential information of the Company or of the other company; and the nature of the relationship between the Company and the other company.

> **(iv)     Related Parties.** Prior to entering into any "related party transactions," as such term is defined under the Company's Related Person Transactions Policy, you must fully disclose the nature of the related party

transaction to the Company's Management. Any dealings with a related party must be conducted in such a way that no preferential treatment is to this business.

99.     The Code of Conduct also emphasizes that "[e]mployees, officers and Directors may not exploit for their own personal gain business opportunities that are discovered through the use of corporate property[]" and indicates that "[t]he only prudent course of conduct for our employees, officers and Directors is to make certain any use of Company property or services that is not solely for the benefit of the Company is approved by Management and disclosed to the Board."

100.    In a section titled "Obligation Under Securities Laws," the Code of Conduct provides the following in relevant part with respect to disclosure in public filings:

> Management is responsible for ensuring that the disclosure in the Company's periodic reports is full, fair, accurate, timely and understandable. In doing so, Management shall take such action as is reasonably appropriate to: establish and comply with disclosure controls and procedures and accounting and financial controls that are designed to ensure that material information relating to the Company is made known to them; confirm that the Company's periodic reports comply with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and ensure that information contained in the Company's periodic reports fairly presents in all material respects the financial condition and results of operations of the Company.

> Management shall not knowingly: make, or permit or direct another to make, materially false or misleading entries in the Company's, or any of its subsidiary's, financial statements or records; fail to correct materially false and misleading financial statements or records; sign, or permit another to sign, a document containing materially false and misleading information; or falsely respond, or fail to respond, to specific inquiries of the Company's independent auditor or outside legal counsel.

101.    The Code of Conduct also provides that "[p]rotecting the Company's assets is a key fiduciary responsibility of every employee, agent, contractor, consultant, officer and Director[]" stating in relevant part:

> Every Company employee, agent, contractor, consultant, officer and Director is personally responsible for all Company funds over which he or she exercises control. Company employees, agents, contractors, consultants, officers and

Directors not specifically authorized by the Board should not be allowed to exercise control over Company funds. Company funds must be used only for Company business purposes and employees preauthorized by the Board must make certain that they stay within preauthorized spending amounts approved by the Board. Every Company employee, agent, contractor, consultant, officer and Director must take reasonable steps to ensure that the Company receives good value for Company funds spent and must maintain accurate and timely records for each expenditure. Expense reports must be accurate and submitted in a timely manner. Company employees, agents, contractors, consultants, officers and Directors must not use Company funds for any personal purpose.

102.    With respect to Ideanomics' accounting practices, the Code of Conduct maintains:

The Company's responsibilities to its stockholders require that all transactions be fully and accurately recorded in the Company's books and records in compliance with all applicable laws. False or misleading entries, unrecorded funds or assets, or payments without appropriate supporting documentation and approval are strictly prohibited and violate Company policy and the law. Additionally, all documentation supporting a transaction should fully and accurately describe the nature of the transaction and be processed in a timely fashion.

103.    The Code of Conduct also provides for the Company's legal compliance, stating in

relevant part:

It is the Company's policy to comply fully with all applicable laws and regulations governing contact and dealings with government employees and public officials, and to adhere to high moral, ethical and legal standards of business conduct. This policy includes strict compliance with all local, state, federal, foreign and other applicable laws, rules and regulations. If you have any questions concerning government relations you should contact the Company's Management.

104.    In a section titled, "Industrial Espionage," the Code of Conduct maintains that:

It is the Company's policy to lawfully compete in the marketplace. This commitment to fairness includes respecting the rights of our competitors and abiding by all applicable laws in the course of competing. The purpose of this policy is to maintain the Company's reputation as a lawful competitor and to help ensure the integrity of the competitive marketplace. The Company expects its competitors to respect our rights to compete lawfully in the marketplace, and we must respect their rights equally. Company employees, agents, contractors, consultants, officers and Directors may not steal or unlawfully use the information, material, products, intellectual property, or proprietary or confidential information of anyone including suppliers, customers, business partners or competitors.

105.    The Individual Defendants violated the Code of Conduct by allowing the Company

to engage in the scheme to issue materially false and misleading statements to the public and to

facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary

duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and

violations of Section 14(a) of the Exchange Act.

### INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

106.    Ideanomics f/k/a Seven Stars Cloud Group, Inc. f/k/a Wecast Network, Inc.,

currently purports to be a global company focused on facilitating the adoption of commercial

electric vehicles ("EV") and developing the next generation of financial services and fintech

products. Although Ideanomics' website purports that it was founded in 2017—the Company has

long operated various businesses under different titles. Ideanomics currently operates in one

segment with two business units, MEG and Ideanomics Capital.

### *Frequent Business Shifts, Related Party Transactions, and the Rise of Blockchain*

107.    Between 2010 through 2017, the Company's primary business activities involved

providing premium video content on demand services, primarily in China through its subsidiaries

under the brand name "You-on-Demand." In September 2016, the Company changed its name

from "You-on-Demand Holdings, Inc." to Wecast Network, Inc., then to Seven Stars Cloud Group,

Inc. in 2017, and finally, Ideanomics in 2018. The Company has changed its corporate name three

times over the course of a three-year period.

108.    From early on, the trend with Ideanomics has included a shifty business model and

touted investments that inevitably ended in failure. Since 2014, the Company has accumulated

$211.9 million in losses. When the Company was focused on providing multi-platform premium media content and even after shifting to on-demand content, the Company disclosed in its annual report filed with the SEC on March 30, 2015 that, "the Company has incurred significant losses during 2014 and 2013 and has relied on debt and equity financings to fund our operations. These conditions raise substantial doubt about our ability to continue as a going concern." According to the JCAP Report, "[j]ust since 2016, [Ideanomics] has burned through $53.7 mln in operating cash flows, most of which has been spent on money-losing investments. The company has an accumulated a deficit of $248.5 mln." *See also* Ideanomics' Annual Report filed with the SEC on March 16, 2020, at F-3.

109.    In 2017, the Company pivoted its business model professedly to become a next generation fintech company. Towards that goal, Ideanomics began trading petroleum products and electronic components that, "the Company believed had significant potential to recognize benefits from blockchain and AI technologies[.]"

110.    In February 2017, the Company acquired two companies affiliated with Defendant Wu, SVG and WAG. In a press release issued on February 1, 2017, the Company announced its acquisition of SVG "with full Board due diligence, review of the third-party fairness opinion and ultimately, unanimous approval[.]" SVG would be rebranded as Wecast Services Group ("WSG") and focus consumer electronics, smart supply chain management operations, and also crude-oil trading, with the addition of WAG. The seller, BT Capital, the Chairman's company, received $800,000 in cash and would be entitled to a promissory note of $50 million, convertible into common stock of the Company at $1.50 per share, subject to a guarantee that SVG would achieve certain revenue and profitability milestones withing 12 months of closing the transaction. The deal contained additional provisions that would further benefit Defendant Wu if SVG ended up

surpassing a net income threshold within three years of closing. The next day, on February 2, 2017, the Company announced its acquisition of WAG, for the sole consideration of adding WAG to SVG's business, thereby including the revenue and gross profit from WAG into the performance guarantee.

111. However, the Individual Defendants neglected to disclose that SVG and WAG would likely fail at achieving the guarantee, as their combined financial performances were poor just prior to the Company's acquisition of them. Collectively, SVG and WAG had obtained only $30 million in revenue, while incurring a loss of $475,046 during the fourth quarter of 2016. As both entities were under Defendant Wu's common control, under Generally Accepted Accounting Principles ("GAAP"), the Company provided SVG's and WAG's combined revenues and losses as of the time common control was established (in November 2016), although disclosures as to these entities were limited. Still, as detailed below, the Individual Defendants maintained that the Company was on track to meet its $280-$300 million revenue guidance for the 2017 year.

112. In August 2017, the Company announced a joint venture deal partnership with Ocasia Group Holdings, a company that was engaged in "a broad range of activities" including trading petroleum products, such as crude oil, fuel oil, refine oil, and oil storage facilities.

113. Towards the end of 2017, the popularity of blockchain, AI, and cryptocurrencies began booming. Blockchain refers to a database of records, containing historical blocks of code that track digital transactions down to the second.[7] Blockchain technology allows for more secure, efficient, and traceable digital transactions. On December 22, 2017, in a press release issued by the Company concerning Defendant Wu's "update on the Company's vision, and specifically on how it relates to Blockchain[.]" The press release stated that:

---

[7]https://www.pcmag.com/news/blockchain-the-invisible-technology-thats-changing-the-world.Last visited July 10, 2020.

"In this case of Seven Stars Cloud, we are applying Blockchain and Artificial Intelligence to create a hybrid solution for supply chain finance, risk management and asset-backed digital securitization. And these are only the first massive opportunities and markets we are targeting, with more plug and play opportunities to be announced in 2018."

114.     By the beginning of 2018, it became clear that many companies had been utilizing the blockchain and AI craze to quickly boost their stock prices, including through name dropping.[8] As a result, regulators, including the SEC began "cracking down" on companies "riding the wave of blockchain hype."[9] After disappointing shareholders in early 2018 with Ideanomics' disheartening financial results, the Individual Defendants sought to artificially boost the Company's stock price through touting its purported integration of blockchain technology into certain of its businesses.

115.     On February 22, 2018, the Company unexpectedly dismissed its independent auditor, Grant Thornton International ("Grant Thornton"), after less than a year. The next day, it announced its new independent auditor, BF Borgers, a small-time auditor with a questionable history. According to a 2017 inspection report conducted by the PCAOB, PCAOB found significant and material deficiencies with BF Borgers' audit opinions, and identified at least 7 audit opinions that "should not have been issued" because of BF Borgers' "failure to obtain reasonable assurance that [it] was required to obtain[.]"[10]

116.     During this time period, the Company also engaged in further related party transactions with its Chairman, and CEO at the time, Defendant Wu. In April 2018, the Company

---

[8] https://www.reuters.com/article/us-blockchain-companies/blockchain-name-grabbing-has-echoes-of-dotcom-bubble-idUSKBN1FS1F3. Last visited July 10, 2020.
[9] https://www.ibtimes.com/sec-looking-companies-vapid-blockchain-hype-2644217 ("Several companies started adding buzzwords like "blockchain" to their brand and offerings over the past few months, which suddenly inflated stock prices."). Last visited July 10, 2020.
[10] https://pcaobus.org/Inspections/Reports/Documents/104-2019-027-B-F-Borgers-CPA-PC.pdf, at p.4-7. Last visited July 10, 2020.

completed its acquisition of Shanghai Guang Ming Investment Management from, two selling shareholders, one being an affiliate of Defendant Wu, for $0.36 million. In September 2018, the Company acquired Grapevine Logic Corp., a company that was 34.5% owned by Defendant Wu's affiliate for $2.4 million. Also in September 2018, Ideanomics acquired $15.5 million of Liberty Biopharma stock from Defendant Wu's entity in exchange for Company shares.

117.   Intent on maintaining shareholder interest and the Company's stock price, the Individual Defendants continued to tout the Company's various investments. In October 2018, the Company announced a deal to acquire 58 acres in West Hartford, Connecticut to create a "Fintech Village." The project would purportedly create over 300 new jobs.

118.   When the Company adopted its current name in August 2018, its Chairman, billionaire Bruno Wu, highlighted the seeming trend of the Company to engage in ideas—at the expense of results, explaining in vague jargon that, "[t]he combination of the 'idea' and the 'field of economics,' yields **Ideanomics –** a new paradigm and model for solving problems, creating efficiencies, and more equitably distributing wealth and knowledge. Ideas create value. With ideas, there is a future. Ideanomics, we are digitizing tomorrow!"

119.   In December 2018, the Company admitted that it never intended to maintain its consumer electronics and crude oil businesses.  The Company disposed of these businesses in 2019 and shifted its focus to the EV industry. Similarly, after touting the Fintech Village project throughout 2019, the Company announced in March 2020 that the project, which had little to show for, was a "non-core asset" and it had begun evaluating plans to divest the project. In June 2020, the Company announced that it had entered agreements to sell the land, which was formerly the University of Connecticut's former West Hartford campus, to the Town of West Hartford.

**<u>False and Misleading Statements during the First Relevant Period</u>**

*February 1, 2017 Press Release*

120.   On February 1, 2017, the Company issued a press release titled, "Wecast Network Completes Acquisition of Sun Group and Issues 2017 Company-Wide Guidance of $280 Million Revenue." The press release touted Ideanomics' acquisition of SVG and the accompanying "guarantee," agreement, stating in relevant part, "[a]s previously mentioned and as part of the original deal, SVG guaranteed it would achieve certain revenue and profitability milestones within 12 months of closing the transaction . . . . As part of the negotiation process, that revenue milestone has been increased to $250 million (up from $200 million) and the gross profit milestone has been established at $15 million."

121.   The February 1, 2017 failed to disclose that SVG and WAG were not profitable businesses and had collectively generated a mere $30 million in revenues and incurred losses of $475,046 during the fourth quarter od 2016, just prior to the Company's acquisitions.

122.   The press release quoted the Company's then-CEO, Defendant Bing, who asserted that "[b]ased on all of this, today [the Company] is confident in issuing Company-wide 2017 guidance of $280 million top-line revenue."

123.   However, the press release failed to disclose and/or misrepresented the supposed guarantee provided by BT Capital and the Company's $280 million guidance because it failed to disclose the combined losses and revenues of SVG and WAG from the fourth quarter of 2016, making it unlikely that the Company would achieve its $280 million revenue guidance; the Company was not operating its consumer electronics business for competitive returns, but just for "research purposes"; and thus, Defendant Wu and the Company, had no basis to support the 2017 guidance.

*February 2, 2017 Press Release*

124.    The following day, on February 2, 2017, the Company issued another press release, this time announcing its acquisition of 55% of WAG, stating in relevant part that, "[n]ot only will it [the acquisition] directly and significantly bolster the financial performance of the Wecast Services Group, but the accretive nature extends even further as [the Company] is acquiring 55% of WAG for no additional stock or monetary consideration."

125.    The press release was false and/or misleading because it failed to disclose the aforementioned facts outlined in paragraph ¶123.

**March 31, 2017 Earnings Call**

126.    On March 31, 2017, the Company hosted an earnings call for investors to discuss, *inter alia*, the Company's financial projections for 2017. During the call, Defendant Wu and Bing highlighted the Company's 2017 guidance, which they announced was being increased from $280 million to $300 million, stating in relevant part:

> [Bruno Wu]: Before I turn the call over to Bing, *I'm pleased to note the* company today is raising its full-year revenue guidance from $280 million to $300 million based on recent visibility of and internal projections for 2017. This projection is based currently on the Wecast Service Group, which, as a reminder, is a new operational and branding for the recently purchased Sun Video Group.
>
> * * *
>
> [Bing]: But for now, as Bruno previously mentioned, we are raising our full-year, topline revenue guidance to $300 million for the full-year 2017.

127.    The statements made by Defendants Wu and Bing were false and/or misleading as they related to the guarantee of BT Capital and the Company's increased guidance for 2017 because they failed to disclose the aforementioned facts outlined in paragraph ¶123.

**May 15, 2017 Earnings Call**

128.    On May 15, 2017, the Company hosted an earnings call for investors to discuss the Company's financial performance for the first quarterly period ended March 31, 2017. During the

call, Defendant Wu encouragingly reaffirmed the new revenue guidance for 2017, maintaining in relevant part, "while we will not be providing any guidance into Q2 revenue today, based on the progression we have seen thus far and the ramp-up that we anticipate, we are reiterating our full-year top-line revenue guidance of $300 million."

129.   The statement made by Defendant Wu was false and/or misleading as it related to the guarantee of BT Capital and the Company's increased guidance for 2017 because it failed to disclose the aforementioned facts outlined in paragraph ¶123.

***November 13, 2017 Press Release***

130.   On November 13, 2017, the Company issued a press release, highlighting the Company's recent aim to "become a global leader in providing next-generation Artificial-Intelligent & Fintech Powered, Supply Chain and Digital Finance Solutions," and touting revenues of $107 million. The press release stated that those revenues only reflected the Company's supply chain management business line, and quoted Defendant Wu who maintained, "[w]ith all that being said, I am pleased to say we are still on track to reach our top line revenue guidance of $300 million USD as projected by the Company in early 2017." The press release also touted that within the Company's crude oil business, "Ocasia is guaranteeing a minimum of $500 million worth of sales volume to the JV Partnership from December 1, 2017 until December 21, 2018."

131.   The statements made in the press release were false and/or misleading as they related to the guarantee of BT Capital and the Company's accrued revenues at that point, because they failed to disclose the aforementioned facts outlined in paragraph ¶123 and also failed to disclose that Ideanomics had a nearly $200 million yet to achieve in revenues to reach its $300 million guidance, only two months to do so, and given the Company's revenues in its video on-

demand business in 2016 (approximately $4.5 million) coupled with the aforementioned, it was clear that the Company was not on track to meet its guidance.

### November 20, 2017 Proxy Statement

132. On November 20, 2017, the Company filed the 2017 Proxy Statement. Defendants Wu, Benya, McMahon, Cassano, Fan, and Shi solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[11]

133. With respect to the Company's Code of Conduct, the 2017 Proxy Statement stated, "[o]ur Board of Directors adopted a code of business conduct and ethics that applies to our directors, officers, employees and advisors, which became effective in January 2016. We have posted a copy of our code of business conduct and ethics on our website at corporate.sevenstarscloud.com."

134. The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

135. The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

---

[11] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

136.    The 2017 Proxy Statement also failed to disclose, *inter alia*, that:(1) the Company was not positioned to meet its 2017 guidance of $300 million; (2) the financial performances of SVG and WAG, including their undisclosed revenues and combined losses made their profitability for Ideanomics highly unlikely; (3) the Company had no reasonable basis for its 2017 guidance; and (4) the Company had been operating its crude oil and consumer electronics business for "research purposes" rather than for competitive returns.

### December 22, 2017 Press Release

137.    During the end of 2017, the Company began touting its business vision to become a "next generation Company" with AI and blockchain technologies incorporated into its services. A press release issued by the Company on December 22, 2017 maintained that Ideanomics had already begun applying these technologies, stating in relevant part:

> [Ideanomics] is a next-generation Artificial Intelligence and Blockchain-Powered Financial Technology Company that offers supply chain and digital finance solutions aiming to disrupt and consolidate supply chain finance, risk management and asset-backed digital securitization. Focusing on Blockchain for a moment I want to be very clear and concise on how Blockchain is powering Seven Stars Cloud business models. . . . In this case of [Ideanomics], *we are applying Blockchain and Artificial Intelligence to create a hybrid solution for supply chain finance, risk management and asset-backed digital securitization*. And these are only the first massive opportunities and markets we are targeting, with more plug and play opportunities to be announced in 2018.

(Emphasis added).

### January 16, 2018 Press Release

138.    On January 16, 2018 the Company issued a press release announcing a "preliminary and unaudited update on Q4 2017 revenues." The press release specifically touted Ideanomics' purported crude-oil business revenues for the quarter, stating in relevant part, "it is worth noting that [the Company's] crude oil supply chain finance and management  "it is worth noting that [the Company's] crude oil supply chain finance and management business alone . . . **did a**

preliminarily reviewed, but still unaudited, $170 million USD in revenue in Q4 2017." (Emphasis in original).

139.    The statement made in the press release was false and/or misleading because the Company's crude oil revenues for the fourth quarter of 2017 was actually only $19 million, approximately, i.e. 11% of the reported $170 million.

<div align="center">

### The Truth Begins to Emerge during the First Relevant Period while False and Misleading Statements Continue

</div>

*February 23, 2018 Press Release*

140.    On February 23, 2018, the Company issued two press releases. One press release, titled, "Seven Stars Cloud Announces BF Borgers CPA PC as New Independent Auditor," announced BF Borgers as Ideanomics' new auditor, after it had dismissed Grant Thornton, one of the largest auditors in the world, the day before. By contrast, BF Borgers was small and had a questionable history with the PCAOB.

141.    The second press release, titled, "Seven Stars Cloud Anticipated to Achieve Record Revenues in 2017 and Provides 2018 Fiscal Year Revenue and EBITDA Guidance," revealed that the Company's revenues would be significantly lower than the oft repeated guidance throughout 2017. Specifically, the press release indicated that the Company would achieve $156 million less than the $300 guidance, or between $125-$144 million for the 2017 fiscal year. According to the press release, which quoted Defendant Wu, the Company's remediation efforts to address deficiencies uncovered related to the Company's disappointing performance included "reliev[ing] its former Chief Executive Officer of his responsibilities[]" as Ideanomics shifted its business to focus on AI and blockchain. The press release specifically stated in relevant part:

> *Unanticipated personnel issues that led to internal communication and internal administrative oversights that materialized during the Company's 2017 fiscal year, resulted in what is anticipated to be 2017 revenue that is below prior and recent guidance expectations.* However, the Company and management

<div align="center">44</div>

specifically, believes that it has taken strong and immediate actions to cure the causes of these deficiencies. Because of the foundation built and steps taken during 2017, the Company believes it is well positioned for continued growth in 2018. Specifically: . . . ***The Company executed the first phase of its strategic and integration plan by acquiring, investing in, or partnering with firms focused on Artificial Intelligence, Blockchain and Alternative Trading System platforms***; [and] . . . ***The Company relieved its former Chief Executive Officer [Bing] of his responsibilities and Mr. Robert G. Benya joined the Company as President, Chief Revenue Officer & Board Director.***

(Emphasis added).

142.    On this news, the Company's stock price fell approximately 39.3%, from closing at $2.80 per share on February 22, 2018, to close at $1.70 per share on February 23, 2018.

### March 30, 2018 Form 10-K

143.    On March 30, 2018, the Company filed its 2017 10-K, which was signed by Defendants Wu, McMahon, Cassano, Fan, Shi, Benya, Zhao, and non-party Simon Wang. In addition to confirming the disappointing financial results, the 2017 10-K touted the Company's blockchain and AI technologies, stating in relevant part:

We intend to run the engine upon its Venus blockchain based platform, which includes TPaaS & VPaaS system. As of fourth quarter of 2017, TPaaS system went into trial operation. In 2018, we intend to strengthen our engine seven operation by including among other things i) Venus platform fully operational, and ii) establishing blockchain based supply chain finance model.

144.    Attached to the 2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendant Wu and then-CFO Simon Wang, attesting to the accuracy of the 2017 10-K.

### May 15, 2018 Earnings Call

145.    On May 15, 2018, the Company hosted an earnings call for investors to discuss the Company's first quarter ended March 31, 2018. During the call, Defendant Wu touted the Company's "four layers" of blockchain technology that had integrated/was purportedly integrating

into its consumer electronics and crude oil businesses to "greatly increase the margin" of its

business, stating in relevant part:

> If we just do supply chain, then the gross margin is very low. But however, the supply chain business provides a foundation for us to add four layers of pyramid on top of that, which is the digital settlement based on blockchain which is the digital wallets that based blockchain for buyers and sellers which is the digital asset trading place whereas we can capture a transaction fee over all the blockchain-based transactional activities in that particular industry. And on top of that pyramid is the indexing and future derivative computation using super artificial Intelligence and dynamic ontology technology. ***So we are now in the middle of transforming—we did with the crude oil. What we did with the crude oil is going to greatly increase the margin of Ocasia subsidiary and we are about ready to in the next couple of quarters do the same thing with electronic vertical.***

146.    The statement made by Defendant Wu was false and/or misleading considering

recent SEC scrutiny over companies seeking to artificially capitalize on the blockchain craze and

the Company's business shift to becoming an AI and blockchain based Company, because it failed

to disclose and/or misrepresented that the Company had not integrated AI or blockchain into its

crude oil business.

### August 13, 2018 Form 10-Q and Earnings Call

147.    On August 13, 2018, the Company filed its quarterly report with the SEC for the

second quarterly period ended June 30, 2018 on a Form 10-Q (the "2Q18 10-Q"), which was

signed by Defendant Tovar. The 2Q18 10-Q maintained that, "[a]s part of our blockchain and AI

focused strategy, we are currently focused on consumer electronics and the crude oil trading

business in supply chain management with the intent to migrate this on to the blockchain with AI

capabilities."

148.    Attached to the 2Q18 10-Q were SOX certifications signed by Defendants Wu and

Tovar attesting to the accuracy of the 2Q18 10-Q.

149.    The statements made in the 2Q18 10-Q were false and/or misleading considering

recent SEC scrutiny over companies seeking to artificially capitalize on the blockchain craze and

the Company's business shift to becoming an AI and blockchain based Company, because they failed to disclose and/or misrepresented that the Company had not integrated or intended on integrating AI or blockchain into its crude oil or consumer electronics businesses and intended to operate those businesses for research purposes only, rather than for competitive gains.

150.   The same day, the Company hosted an earnings call with investors to discuss the second quarter ended June 30, 2018. During the call, Defendant Benya stated,  "[p]roduct four is TradeTech which involves the use of blockchain, active ledger and index products to ramp up margins significantly in our supplier chain finance services business, which is a key driver of ***our current and rapid topline revenue growth.***" (Emphasis added). As such, Defendant Benya attributed the Company's revenue growth to TradeTech, which supposedly applied blockchain, and Ideanomics' consumer electronics and crude oil business through WSG, the Company subsidiary SVG was rebranded as.

151.   The statement made by Defendant Benya was false and/or misleading considering recent SEC scrutiny over companies seeking to artificially capitalize on the blockchain craze and the Company's business shift to becoming an AI and blockchain based Company, because it failed to disclose and/or misrepresented that the Company had not integrated AI or blockchain into its crude oil or electronics businesses and consequently, blockchain was not a key driver of the Company's revenues.

### *August 28, 2018 Form 10-K/A*

152.   On August 28, 2018, before the market opened, the Company filed an amended annual report for the fiscal year ended December 31, 2017, due to SEC comments about the Company's previously filed 2017 10-K (the "2017 10-K/A"). The 2017 10-K/A disclosed that the Company's revenues for its crude oil business consisted of approximately $18.9 million from

related parties, an amount significantly lower than the Company's touted $170 million for the fourth quarter of 2017.

153.    On this news, the Company's stock price fell approximately 18.2%, from closing at $4.95 per share on August 27, 2018, to close at $4.05 per share on August 28, 2018.

154.    A few days later, on August 31, 2018, the Company filed a Schedule 14C with the SEC, disclosing to shareholders that on August 3, 2018, the Board had approved the issuance of 16.5 million shares of Ideanomics stock, at $1.50 per share to the Chairman, Defendant Wu's, controlled entity, BT Capital, i.e. $24.75 million, which represented about half of what BT Capital would have received under the acquisition agreement had the Company achieved the revenue guarantee. On August 31, 2018, the Company's shares were trading at a high of $4.27 per share.

155.    The statements in ¶¶120, 122, 124, 126, 128, 130, 137-138, 141, 143-145, 147-148, and 150 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose *inter alia*: (1) the Company was not positioned to meet its 2017 guidance of $280-300 million; (2) the financial performances of SVG and WAG, including their undisclosed revenues and combined losses made their profitability for Ideanomics highly unlikely; (3) the Company's crude oil business only provided Ideanomics with $19 million in revenue for the fourth quarter of 2017, despite representations that it provided $170 million during that period; (4) the Company thus had no reasonable basis for its 2017 guidance; (6) as it touted its consumer electronics business and crude oil business, Ideanomics represented it had been integrating AI and blockchain technology into those businesses, when it had not and did not intend to do so, and blockchain was thus not driving the Company's revenues; and (7) the Company had been operating its crude oil and consumer electronics business for "research purposes" rather than for competitive

returns. As a result of the foregoing, the Company's public statements in the Second Relevant Period were materially false and misleading.

**The Truth Emerges as to the First Relevant Period**

156.    On November 14, 2018, before the market opened, the Company issued a press release announcing the Company's financial results for the third quarter ended September 30, 2018. The press release revealed that the Company would be divesting its crude oil trading and consumer electronics businesses. Specifically, the press release stated:

> Although to date, aside from our legacy video-on-demand business, only our commodities trading business has generated revenues, given that our oil trading and consumer electronics businesses have realized low margins in relation to top line sales, we decided to focus our efforts on the higher margins we believe may be achievable in our digital securitized asset business. As a result, we intend to phase out our oil trading and consumer electronics businesses, with the intention to fully divest these assets in the near future.

157.    On this news, the Company's stock price fell approximately 48.8%, from closing at $3.26 per share on November 13, 2018, to close at $1.67 per share on November 14, 2018.

158.    After the market closed on the same day, the Company filed its 3Q18 10-Q, revealing that Ideanomics' "commodities trading business does not currently integrate blockchain or AI based logistics solutions." The Company neglected to mention the "Venus blockchain" platform previously highlighted in its 2017 10-K.

159.    In December 2018, the Company sold WSG to an entity affiliated with Defendant Wu, "Hooxi" for a "nominal amount." The Company failed to disclose the amount, but revealed in its annual report filed with the SEC on April 1, 2019 (the "2018 10-K") that Ideanomics incurred a loss of approximately $1.2 million loss and stated that the Wecast business earned a mere $347,000 in annual sales and net assets of approximately $46,000.

160.    On December 14, 2018, the Company amended its 2017 10-K yet again, this time adding the following sentence: "[o]ur crude oil trading business does not currently integrate

blockchain- or AI-based logistics solutions." The second amended 2017 10-K also stated that, "[w]hile we generate revenues from our crude oil and consumer electronics business, we engage in this business largely for research purposes to support our development of fintech solutions for this space, and not primarily with a view to competitive returns."

161.    On April 1, 2019 the Company filed the 2018 10-K, which broke down Ideanomics' revenues and gross profits by segments, revealing the $19 million made in the crude-oil segment--$18.9 million of which was attributed to a related party as mentioned above, and $260 million in revenue for the year ended 2018, far from the $500 million Ocasia guarantee touted by the Company. The 2018 10-K also revealed that the Company's gross profit for the year fell by over 50% compared to the previous year, from $7.1 million in 2017 to $3.1 million in 2018.

162.    In late 2019, the Company shifted its business once again, to its current focus in EVs and Fintech businesses.

### False and Misleading Statements during the Second Relevant Period

*March 20, 2020 Press Release*

163.    On March 20, 2020, the Company issued a press release announcing the scheduled beginning of operations at the MEG Center, set for May 1, 2020. The press release boasted that "[t]he 1 Million square foot site has been renovated as a permanent EV expo center, the cost of which has been met by development funds from the Chengyang business district of the city of Qingdao, in China's Shandong province." The press release continued to describe the expected operations at the massive MEG Center, stating in relevant part:

> Ideanomics' Mobile Energy Global division ("MEG") will be joined at the site by more than 20 partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solutions, financial services, insurance, vehicle and license plate registration services, and others from Qingdao. The EV hub is designed to be a focal point for commercial fleet operators and the EV industry alike, with MEG headquartering its management, sales and marketing, and administrative operations at the site.

164.     Regarding the current MEG Center site and the Company's related plans and prospects, the press release stated in relevant part:

> The city of Qingdao currently operates an automotive sales and servicing center for a range of vehicle manufacturers at the site, these operations are being assumed by MEG as part of the expanded plans and focus onto EV. This will see MEG assume the revenues derived from those activities, with a run rate of approximately RMB 1 Billion in 2019 ($140 Million USD), with profit margins in the 8% range, as well as facilitate an expedited ramp-up of staff and operations at the site.

> Due to the successful development of the Mobile Energy Group Center and the high demand for comprehensive EV services, MEG has received inquiries from several other cities with regards to establishing similar operations. Where there is financial support to do so, from local governments and manufacturers, and sufficient market demand as we have seen in Qingdao, MEG may decide to develop multiple regional centers in the future.

### *May 11, 2020 Form 10-Q*

165.     On May 11, 2020, the Company filed its quarterly report with the SEC for the first quarterly period ended March 30, 2020 on a Form 10-Q (the "1Q20 10-Q"), which was signed by Defendant McCarthy. The 1Q20 10-Q maintained that "[t]here were no changes in our internal control over financial reporting that occurred during the quarter ended March 31, 2020, which have materially affected or would likely materially affect our internal control over financial reporting."

166.     Attached to the 1Q20 10-Q were SOX certifications signed by Defendants Poor and McCarthy attesting to the accuracy of the 1Q20 10-Q.

### *May 26, 2020 Press Release*

167.     On May 26, 2020, the Company issued a press release announcing that the MEG division's "Qingdao subsidiary Qingdao Chengyang Ainengju New Energy Sales and Service Co. has officially launched the largest auto trading market in Qingdao at MEG's Qingdao EV hub." The press release further highlighted the operations at the MEG Center as follows:

The MEG Center in Qingdao now hosts a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles onsite. It offers a one-stop buying experience that includes financial services and onsite vehicle registration services. The auto trading market, which was rolled into MEG as part of the investment from Qingdao City, attracts a large audience which MEG will leverage to help educate the general population through its upcoming EV-centric welcome center and onsite EV manufacturing partners. Additionally, the Center will use influencer-based marketing of new energy and used cars to leverage the impact influencers have on big ticket purchases in Asia.

168.    The press release again described the MEG Center as "a one million square foot EV expo center in Qingdao, Shandong Province[]" and included the following date-stamped image:



©2020 Ideanomics
Ideanomics' MEG Center in Qingdao opened May 1, 2020. This one million square foot expo center offers comprehensive retail and commercial services including new EVs and used vehicles, financing, insurance, and registration services.

169.    The press release further stated in relevant part:

The Center announced a soft launch on May 1, 2020 and will house partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solution providers, financial services, insurance companies, vehicle and license plate registration services, and others including a state of the art MEG Welcome Center. Ideanomics will be holding a ribbon-cutting ceremony for the MEG Center in Qingdao in the summer in conjunction with its Annual General Meeting.

***June 9, 2020 Press Release***

170.    On June 9, 2020, the Company issued a press release announcing, "that auto dealers operating in its subsidiary, [MEG] expo center in Qingdao, have sold 2,139 vehicles for a total value of RMB 235 Million or USD 33 Million." The press reiterated that the MEG Center "began operations on May 1[]" and continued to describe the impressive operations and prospects of the center based on the short period following its launch:

> Based on the level of sales activity in the first week of June, this month's sales are expected to exceed May levels. In China, the high season for car buying is from October to January. In its first five weeks of being operational, the dealers at the MEG Center have received high levels of interest, and management is optimistic that it can achieve its previously stated RMB 1 Billion sales target in 2020.

171.    The press release maintained a positive outlook for the MEG Center's profitability, even in spite of the COVID-19 outbreak in China, stating in relevant part:

> China, much like the rest of the world, has been negatively impacted by the shutdowns resulting from COVID-19. As the country has only begun to relax restrictions last month, many businesses are struggling to recover. The local government provided the facility rent-free to Ideanomics. Management felt that, during these unprecedented times, MEG should support local businesses and passed on savings from the government's generosity by not charging commissions or rent to its dealers for the month of May. As MEG's partners strengthen their financial positions, management will gradually implement its fee model starting in mid-June. Note that the May and early June sales were primarily used vehicles, and that MEG will be charging commissions for electric vehicles (EVs) with the manufacturers' direct sale model. MEG's total financing solutions will be available starting in July, and with its high-profit margins, should make a meaningful contribution to the Center's profitability.
>
> 'The region loosened restrictions on business activities in early May, so we are very pleased with the Center's high levels of activity at this early stage. The Center's solid customer foot traffic indicates that the country's economy is on a steady path to recovery and there is a strong appetite for passenger and commercial vehicle sales which bodes well for MEG,' said Ideanomics Chairman Dr. Bruno Wu. 'The initial activity combined with the projected growth for the remainder of 2020 reinforces our belief that the MEG Center will be a material source of revenue for Ideanomics.'

172.    The press release was accompanied by the following date-stamped image:

53



©2020 Ideanomics

173.    The Company proceeded to issue several press releases thereafter touting new orders from various groups. On June 23, 2020, after teetering around or below $1.00, losing its compliance with NASDAQ listing requirements in January 2020 and receiving a notice of delisting from NASDAQ, the Company's share price rose to over $3.00 per share, which had not occurred since November 2018.

174.    The same day, on June 23, 2020, the Company filed a Registration Statement on Form S-3, announcing Ideanomics' intent to offer $250 million worth of common stock in a public offering.

175.    The statements in ¶¶163-172, were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose *inter alia*: (1) the MEG Center situated in Qingdao, China was not in fact a "one million square foot EV expo center"; (2) as part of its promotional efforts, the Company utilized doctored photographs of the purported MEG Center in its press releases; (3) Ideanomics overplayed the strength of its EV business operations in China; and (4) the Company failed to maintain internal controls. As a result of the

foregoing, the Company's public statements in the Second Relevant Period were materially false and misleading.

### The Truth Emerges as to the Second Relevant Period

176.    On June 25, 2020, in a series of tweets, Hindenburg called attention to the Company's recent press releases about its MEG Center operations in China, calling the Company "an egregious & obvious fraud." Hindenburg specifically pointed to the Company's press release issued on June 9, 2020 and the "2020 timestamp[ed]" image, stating that Hindenburg "found a photo displaying the exact same layout from 2018, years before the supposed soft launch of [the Company's] MEG center in 2020." Hindenburg's tweets also compared the two photos and maintained that the MEG logo from the June 9, 2020 press release image "has been photoshopped to replace the original Mandarin. The MEG letters form a straight line despite the logo supposedly on a curved surface. To repeat, the company doctored photos in its PR to suggest it owns/operates the facility."

177.    Hindenburg similarly pointed out the photo included in the Company's May 26, 2020 press release, in which Hindenburg identified "the exact same signs of photoshopping that impose [Ideanomics'] flat MEG logo on a curved surface. This strikes us as a clear effort by the company to manipulate the photographs in order to drive up its stock price." Hindenburg included the following image in its tweet:



178.    Hindenburg also sent its own investigator to the MEG Center and tweeted the picture taken by the investigator, explaining that, "[t]he facility is actually operated by almost 100 sales groups. None of those we spoke with heard of [Ideanomics] or MEG. We spoke to the main office (in a recorded conversation) and they confirmed the same." According to Hindenburg, its investigator also called five of the Company's purported "customers that are helping drive its supposed EV business. None of them were aware of Ideanomics and none of them were able to confirm doing business with [Ideanomics]." Hindenburg continued to state that "[w]e have watched [Ideanomics'] stock pump and dump on a neverending [sic] stream of press releases over the last 5 years and we expect this time will be no different, resulting in major shareholder losses or regulatory intervention. Buyer beware."

179.    The same day, on June 25, 2020, J Capital Research published the JCAP Report, valuing the Company at "a zero" and calling into question Ideanomics' sporadic business pivots, the purported buyers touted in Ideanomics' press releases, the dubious operations of the MEG Center, and Ideanomics' auditor's negative history with the PCAOB. The JCAP Report maintained that, "[t]he company changes its name and promotional story so frequently that it's hard to keep up. One thing remains a constant, despite all the press releases, buzzwords and hype: shareholders

get wiped out." In a tweet, J Capital Research also disclosed that, "[w]e called all the 'buyers' named in [Ideanomics'] press releases this month. Not a single one had made a purchase. One of them thanked us for alerting them to 'fake news.'"

180.     The JCAP Report further stated in relevant part:

[o]ur investigators have been unable to establish that IDEX has a showroom in Qingdao, whence the contract announcements have been flowing. . . . We had a hard time identifying this expo center but eventually found an IDEX subsidiary that has a mail drop at a 1 mln sqft shopping mall in Qingdao's Chengyang District. Renovations are news to the companies that operate there. In fact, the shopping mall is in financial distress and is not honoring contracts with people who bought shops there, according to a local news report. Neither the manager of the shopping mall nor two store owners we contacted in the center have ever heard of IDEX, any of its subsidiaries or joint ventures, or the EV showroom the company says it opened on May 1.

181.     In a section titled, "The Latest Promote," the JCAP Report pointed out that between "June 11-22, IDEX announced five contracts for electric vehicles . . . .On June 23 and 24, we spoke with representatives from four of the five 'buyers.' All four denied there were contracts. One of them went as far as to tell our staff member that the IDEX press release is 'fake news.' . . . We were unable to locate the fifth partner [.]"

182.     Also on June 25, 2020, Ideanomics issued a press release announcing a deal between the Company and Zhongsen Tower, a service provider "affiliated with a division of China Tower Holdings which was ranked 71st in the Forbes Top 100 Digital Companies List and 22nd in the Fortune Future 50 in 2019."

183.     On this news, despite another deal announcement, the Company's stock price fell approximately 21%, from closing at $3.09 per share on June 24, 2020, to close at $2.44 per share on June 25, 2020.

184.     On June 26, 2020, the next day, the Company issued a press release in response, launching the first of its counter-attack refuting the reports, stating that it, "would like to clarify

the status of its one million square feet EV hub in Qingdao, Shandong province." The press release

detailed the supposed phases of the MEG Center's launch, stating in relevant part:

> [T]he existing new and used sales business at the site was to be folded into the MEG center activities. Along with the commencement of our fleet sales division, this compromised Phase I. The MEG center had a soft launch on May 1, with a fuller opening on May 25, 2020, as announced in press releases dated March 20, 2020, May 18, 2020, and May 26, 2020, when the center was allowed to open fully after COVID-19 lockdown measures were eased in Qingdao. These activities occupy approximately 20,000 square meters, or 215,000 square feet, and the Company has detailed activity from both existing dealership business at the site and its commercial fleet sales in recent press releases.
>
> Phase II of the opening will see an additional 20,000 square meters come online and is subject to renovation in preparation for MEG and its participating partners. This includes the MEG welcome center and executive offices. As previously communicated, the timeline for this phase will coincide with the ribbon cutting ceremony and official opening in the summer of 2020.
>
> Phase III of the project, and the remaining 60,000 square meters will come online as further renovations are completed.

185.    The press release flew in the face of the Company's continued claims that the MEG

Center "is a one million square foot EV expo center" and "now hosts a full suite of car dealer

services for new energy and used cars with a capacity of 18,000 vehicles onsite. It offers a one-

stop buying experience that includes financial services and onsite vehicle registration services." It

further was contrary to Ideanomics' reminder in its June 9, 2020 press release that "the MEG

Center in Qingdao began operations on May 1[]" and, for the first time, scaled back the Company's

earlier representations concerning the one million square foot MEG Center, and revealing that the

MEG Center was in "Phase 1" and its activities "occupy approximately  20,000 square meters, or

***215,000 square feet***[.]" (Emphasis added).

186.    The June 26, 2020 press release included exterior drone footage of the MEG Center.

Hindenburg criticized the video footage in a series of tweets on June 28, 2020, releasing its own

footage taken from the interior of the MEG Center. Hindenburg maintained, "[w]e think the reason

the [C]ompany isn't posting video from INSIDE the facility is because such video shows they have absolutely no presence on site whatsoever." According to Hindenburg's investigations, reported on its website on June 26, 2020,[12] the MEG Center "is actually called Qingdao Fidelity International Trade City . . . which shows only few cars for sale, and no sign of the company on site." Hindenburg continued, noting, "[t]here were no signs of [Ideanomics] having any presence on site and vendors and managers we spoke with had never heard of them. We spoke with the only vendor of electric vehicles on site . . . and he had no idea who the company was." Hindenburg reiterated its position about the Company and maintained that it "further confirmed [its] allegations . . . about [p]hotoshopped images in the company's press releases. We were able to unearth photographs from 2015 which appear nearly identical to photos used in IDEX's May 2020 'launch' PR about the MEG."

187.    The Company issued another press release the same day, on June 26, 2020, refuting allegations raised by Hindenburg and stating in relevant part that although the MEG Center was not one million square feet, as represented, Ideanomics "will be expanding to 40,000 square meters and eventually 100,000 square meters." The press release did not address the rest of Hindenburg's allegations, including those regarding the doctored photos.

188.    On this news, the Company's stock price declined further from closing at $2.44 per share on June 25, 2020, to close at $1.46 per share on June 26, 2020, representing a total drop of approximately 53% over a two-day period.

189.    On June 29, 2020, the Company issued yet another press release, purportedly refuting the claims made by Hindenburg and J Capital Research. The press release purportedly

---

[12] https://hindenburgresearch.com/ideanomics/. Last visited July 9, 2020.

included documentary evidence of Ideanomics' announced deals, but left numerous allegations unaddressed.

190.    On July 1, 2020 Hindenburg issued a tweet about the Company's June 25, 2020 press release, which claimed "Zhongsen Tower [was] 'affiliated with a division of China Tower Holdings,'" and noted that China Tower had issued a press release on June 30, 2020 "directly refuting this claim and 'reserving all rights to pursue legal actions.'"

191.    On July 2, 2020, Ideanomics issued a press release "clarifying Zhongsen's relationship with provisional divisions of China Tower Group[]" stating in relevant part:

> At the end of that press release, Ideanomics referenced an entity named China Tower Holdings. The correct reference is to provincial divisions of China Tower Group. China Tower Group, through its provincial divisions, is more accurately described as a company that works closely with, or in partnership with, Zhongsen Tower rather than "affiliated with." Further, the reference in the June 25, 2020 press release to China Tower Holdings being ranked 71st in the *Forbes Top 100 Digital Companies List* and 22nd in the *Fortune Future 50* in 2019 was an error. The Company did not intend to indirectly reference the Hong Kong publicly listed company China Tower Corporation Limited, which has the Forbes and Fortune Future rankings.

192.    On July 3, 2020, Hindenburg announced in a tweet that it send a letter to the Board, executive team, and auditors of the Company outlining 24 sets of questions and concerns. Hindenburg issued another tweet on July 9, 2020, publishing the text of its letter and stating in relevant part, "[l]ast week, we sent this letter to [Ideanomics'] directors, executives, and auditors that raised numerous questions about the company's claimed operations and have not received a single response."

**The Individual Defendant Knowingly Made or Caused the Company to Make the False and Misleading Statements during the First Relevant Period**

193.    During the First Relevant Period, certain of the Individual Defendants were senior officers and directors of the Company, and as such, had access to and control over internal

Company documents and communications related to SVG's and WAG's combined losses and revenues during the fourth quarter of 2016, their resulting unprofitability, and other facts regarding the Company's operations that would have alerted them to the falsity of the statements made during the First Relevant Period. As detailed above in the Company's own press release, the Board, which included many of the Individual Defendants, unanimously approved the related party transaction and the transaction did not and could have taken place without the parties' completion of due diligence. The negotiation process leading up to the SVG acquisition occurred over the course of several months. The Company first announced its entry into a non-binding term sheet, which included a $200 million guarantee at the time in September 2017. Thus, the Individual Defendants, many of whom approved the acquisition, had information and/or access to the financial data of SVG and WAG, at least for the last quarter of 2016 during the time when the Company was engaged in due diligence and negotiations on the terms of the agreement.

194.    Indeed, Defendant Wu, the Chairman of the Board, controlled SVG and WAG through his control of BT Capital and thus had access to their financial records.

195.    As such, certain of the Individual Defendants were aware, or were recklessly unaware of the combined losses and revenues of SVG and WAG and their unprofitability. Despite this, certain of the Individual Defendants caused the Company to issue the materially false and misleading statements described herein regarding the $280-300 million guidance for 2017, which was significantly based on the guarantee provided by the SVG and WAG acquisition. The Company added several entities related to Defendant Wu to the purported guarantee, often at no consideration beyond adding those companies to the guarantee, indicating that the Defendants were aware that the guarantee would not likely be achieved.

196.     Defendants Wu and Bing, as the Company's CEO and CFO at the time were further under a duty to monitor SVG's and WAG's financial records pursuant to GAAP requirements, particularly Defendant Wu who controlled SVG, WAG, and Ideanomics at the time. The Company recognized in its SEC filings during the First Relevant Period that SVG and WAG "were controlled by [] Chairman Bruno Wu since November 10, 2016" requiring the Company to adjust its financial statements to reflect SVG's and WAG's gross losses under GAAP and the Accounting Standards Codification ("ASC") Topic 805 related to businesses combination issued by the Financial Accounting Standards Board.

197.     The suspicious dismissal of Grant Thornton and its replacement with BF Borgers right after it became clear that the Company would not achieve its $300 million guidance further adds to the inference that the Individual Defendants were aware of the misrepresentations they were making and/or causing the Company to make during the First Relevant Period.

198.     Moreover, the Individual Defendants had access to information related to Ideanomics' crude oil business revenues when it caused the Company to issue the January 2018 press release regarding the supposed $170 million in revenue for the fourth quarter of 2017. In fact, the press release maintained that the Company had reviewed this data. However, a review would have revealed that the crude oil business revenue was approximately $19 million— significantly below $170 million. Such a dramatic blunder could only have been made knowingly or recklessly. In addition, as later disclosed, the Company's crude-oil revenues during the fourth quarter of 2017 were attributed, almost entirely, to a related party transaction. Accordingly, the Individual Defendants had knowledge and access to information that revealed the true revenue achieved by the crude oil business during that quarter and the lack of additional revenues from third parties. During the earnings call with investors on November 13, 2017, Defendant Wu further

assured investors that the Company would have a "very good picture" of the guidance for 2018—implying that the Defendants would have analyzed the Company's growth prospects, including within its crude oil business, which would have revealed the gaping disparity between the crude oil business actual revenues and the touted $170 million announced a few months later.

199.    Similarly, the Individual Defendant were aware of or recklessly disregarded that the Company had not and did not intend to integrate blockchain into its crude oil and/or consumer electronics businesses. Defendants Yu, Benya, and Tovar in particular possessed and/or had access to this information during the time that they were making and/or authorizing statements that indicated otherwise. Also, during the time when the statements were made touting Ideanomics' blockchain platform and/or integration, the SEC was increasingly scrutinizing companies that sought to capitalize off dropping buzzwords associated with the blockchain trend, thereby artificially inflating their stock price. Notably, in response to inquiry by the SEC, the Company amended its 2017 10-K, and excluded previous statements made pertaining to its blockchain platform. During the course of reviewing and amending the 2017 10-K, the Individual Defendants, many of whom signed the 2017 10-K would have, or should have come to know that the Company had not been integrating blockchain into its businesses.

200.    Many of the Individual Defendant who were officers and/or directors during the First Relevant Period had specialized knowledge about technology, media, sales, fintech, blockchain, and other experiences that made them capable of understanding and comprehending the underlying facts that should have been disclosed in the Company's press releases, SEC filings, and during earnings calls with investors.

201.    As outlined above, Defendant Wu financially benefitted from the misrepresentations described herein that artificially inflated the Company's stock price and the

various related party transactions with his entities that the Individual Defendants approved. As a result of the artificially inflated stock price, the Company was able to acquire several companies for millions of dollars and Company shares, avoid insolvency, and raise capital.

202.   The string of terminations and resignations that took place during the First Relevant Period also supports the inference that the Individual Defendants were aware of and/or recklessly disregarded the fraud discussed herein. For example, the same day that the Company entered into the purchase agreement for SVG on January 30, 2018, the Company's CFO at the time, Mei Chen, submitted her resignation to the Board. Defendant Bing was reportedly terminated on October 9, 2017, right before the Company would confirm that it was on track to meet its $300 million revenue guidance. Interestingly, Bing's departure was disclosed as a resignation and only later did the Company state that he was relieved of his position—purportedly in connection with remediating deficiencies related to the Company's disappointing 2017 financial results. Two days before the Company announced its intent to divest its crude oil and consumer electronics business, on November 12, 2018, Defendant Benya resigned. Finally, the day the Company made its announcement regarding its intent to sell the businesses it effectively purchased from Defendant Wu, on November 14, 2018, Defendant Wu also temporarily resigned.

203.   The Company's crude oil and consumer electronics businesses provided it with its primary revenue during the First Relevant Period, and were thus significant to the Company's core businesses operations. Likewise, the Company's purported integration of blockchain was professedly the future of the Company. Given their import, it is reasonable to assume that the Individual Defendants were aware of the aforementioned facts.

## DAMAGES TO IDEANOMICS

204.    As a direct and proximate result of the Individual Defendants' conduct, Ideanomics has lost and expended, and will lose and expend, many millions of dollars.

205.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Actions, as well as investigations of the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

206.    Such losses include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives.

207.    As a direct and proximate result of the Individual Defendants' conduct, Ideanomics has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

208.    Plaintiff brings this action derivatively and for the benefit of Ideanomics to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Ideanomics, waste of corporate assets, abuse of control, gross mismanagement, unjust enrichment, and violation of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

209.    Ideanomics is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

210.     Plaintiff is a current shareholder of Ideanomics and has continuously held Ideanomics common stock during all relevant times. Plaintiff will adequately and fairly represent the interests of Ideanomics in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

211.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

212.     A pre-suit demand on the Board of Ideanomics is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Wu, Poor, Cassano, Edelson, Fadem, Fan, McMahon, Wallace, and Yang (the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

213.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts during the First and/or Second Relevant Periods, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

214.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors

breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

215.    Additional reasons that demand on Defendant Wu is futile follow. Defendant Wu is the founder of the Company and has served as Ideanomics' Chairman since January 2016, except for the brief 3-month period when he stepped down.  He also served as the Company's CEO during the First Relevant Period, from October 2017 through November 2018. As outlined above, Defendant Wu holds a considerable percentage of voting power through his stock ownership. The Company is also engaged in several related party transactions with Defendant Wu's affiliated entities, including the Company's purchase of several businesses from BT Capital, Defendant Wu's controlled entity.  Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Wu with handsome compensation, including $852,832 during the fiscal year ended December 31, 2018. Defendant Wu was ultimately responsible for several of the false and misleading statements and omissions that were made in the First Relevant Period, and also contributed to the misrepresentations made during the Second Relevant Period. As the Company's highest officer during the First Relevant Period and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Wu is a defendant in the Securities Class Actions. For these reasons, too, Defendant Wu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.    Additional reasons that demand on Defendant Poor is futile follow. Defendant Poor has served as the Company's CEO since February 2019 and has served as a director of the

Company and President of the Connecticut Fintech Village since December 2018. He also previously served as the Company's COO. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Poor with his principal occupation, and he receives handsome compensation, including the potential for $400,000 and stock options of up to 2,000,000 shares. As the Company's highest officer during the Second Relevant Period and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Poor is a defendant in the Second Class Actions. For these reasons, too, Defendant Poor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217.     Additional reasons that demand on Defendant Cassano is futile follow. Defendant Cassano has served as a Company director since January 2008. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Cassano has received and continues to receive compensation for his role as a director as described above.  As a long-time Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements during the First and Second Relevant Periods, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Cassano signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, too, Defendant Cassano breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Edelson is futile follow. Defendant Edelson has served as a Company director since September 2019. He also serves as Chair of the Governance and Nominating Committee. Defendant Edelson has received and continues to receive compensation for his role as a director. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements during the Second Relevant Period, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Edelson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.    Additional reasons that demand on Defendant Fadem is futile follow. Defendant Fadem has served as a Company director since August 2019. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Fadem has received and continues to receive compensation for his role as a director. As a Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements during the Second Relevant Period, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Fadem breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.    Additional reasons that demand on Defendant Fan is futile follow. Defendant Fan

has served as a Company director since January 2016. He also serves as a member of the Audit Committee and the Governance and Nominating Committee. Defendant Fan has received and continues to receive compensation for his role as a director, as described above. As a long-time Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements during the First and Second Relevant Periods, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Fan signed, and thus personally made the false and misleading statements in 2017 10-K. For these reasons, too, Defendant Fan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

221.    Additional reasons that demand on Defendant McMahon is futile follow. Defendant McMahon has served as a Company director since July 2010. He has also served as Vice Chairman since January 2016 and served as the Company's CEO in 2012. Defendant McMahon has received and continues to receive compensation for his role as a director, as described above. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements during the First and Second Relevant Periods, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McMahon signed, and thus personally made the false and misleading statements in 2017 10-K. For these reasons, too, Defendant McMahon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

70

222.    Additional reasons that demand on Defendant Wallace is futile follow. Defendant Wallace has served as a Company director since July 2019. Defendant Wallace has received and continues to receive compensation for his role as a director. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements during the Second Relevant Period, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Wallace breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

223.    Additional reasons that demand on Defendant Yang is futile follow. Defendant Yang has served as a Company director since August 2018. Defendant Yang has received and continues to receive compensation for his role as a director, as described above. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements during the Second Relevant Period, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Yang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

224.    Additional reasons that demand on the Board is futile follow.

225.    Demand in this case is excused because the Directors control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Company that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant McMahon is party to a $3 million

loan agreement with the Company, entered in 2012, for which he received a convertible note in the aggregate principal amount of $3 million at an annual interest rate of 4% in consideration. The Company has executed several amendments to extend the maturity date of the note due to McMahon, most recently to December 31, 2020. As outlined above, Defendant Wu is entwined with the Company and has benefitted from several related party transactions between Ideanomics and his affiliated entities. The Directors are unlikely to risk the Company's business by subjecting Defendant Wu to a lawsuit based on the claims asserted herein.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

226.    Additionally, the Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and should have ensured that the Company maintained adequate oversight and internal controls over its disclosures to prevent the Company's participation in the aforementioned misrepresentations. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

227.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, are beholden to and controlled by Defendant Wu, who controls the Company by virtue of his share ownership which provided him with approximately 25.1% of the total shareholder voting power as of November 15, 2019. These shareholdings provide Defendant Wu with significant control over the continued employment of the Directors, especially Defendants Poor, who is also an executive of Ideanomics. Thus, the Directors are unable to

evaluate a demand with disinterest or independence as a result of Defendant Wu's control over them.

228.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability, and demand is futile as to them.

229.    Ideanomics has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Ideanomics any part of the damages Ideanomics suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

230.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

231.    The acts complained of herein constitute violations of fiduciary duties owed by Ideanomics officers and directors, and these acts are incapable of ratification.

232.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ideanomics. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Ideanomics, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

233.    If there is no directors' and officers' liability insurance, then the Directors will not cause Ideanomics to sue the Individual Defendants named herein, as, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

234.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

74

235.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

237.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

238.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

239.    Under the direction and watch of the directors, the 2017 Proxy Statement failed to disclose, *inter alia*: (1) the Company was not positioned to meet its 2017 guidance of $300 million; (2) the financial performances of SVG and WAG, including their undisclosed revenues and

combined losses made their profitability for Ideanomics highly unlikely; (3) the Company had no reasonable basis for its 2017 guidance; and (4) the Company had been operating its crude oil and consumer electronics business for "research purposes" rather than for competitive returns.

240.   Certain of the Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

241.   The 2017 Proxy Statement also referenced the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures. By issuing false and misleading statements to the investing public, certain of the Individual Defendants violated the Code of Conduct. The 2017 Proxy Statement failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

242.   In the exercise of reasonable care, certain of the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including, but not limited to, election of directors, and ratification of an independent auditor.

243.     The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Wu, Benya, McMahon, Cassano, Fan, and Shi, which allowed them to continue breaching their fiduciary duties to Ideanomics.

244.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

245.     Plaintiff on behalf of Ideanomics has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

246.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

247.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ideanomics' business and affairs.

248.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

249.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ideanomics.

250.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

251.     In further breach of their fiduciary duties owed to Ideanomics, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company

was not positioned to meet its 2017 guidance of $280-300 million; (2) the financial performances of SVG and WAG, including their undisclosed revenues and combined losses made their profitability for Ideanomics highly unlikely; (3) the Company's crude oil business only provided Ideanomics with $19 million in revenue for the fourth quarter of 2017, despite representations that it provided $170 million during that period; (4) the Company thus had no reasonable basis for its 2017 guidance; (6) as it touted its consumer electronics business and crude oil business, Ideanomics represented it had been integrating AI and blockchain technology into those businesses, when it had not and did not intend to do so, and blockchain was thus not driving the Company's revenues; and (7) the Company had been operating its crude oil and consumer electronics business for "research purposes" rather than for competitive returns. As a result of the foregoing, the Company's public statements during the First Relevant Period were materially false and misleading.

252.   The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the MEG Center situated in Qingdao, China was not in fact a "one million square foot EV expo center"; (2) as part of its promotional efforts, the Company utilized doctored photographs of the purported MEG Center in its press releases; (3) Ideanomics overplayed the strength of its EV business operations in China; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements in the Second Relevant Period were materially false and misleading.

253.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and

omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

254.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

255.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

256.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

257.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ideanomics has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

258.    Plaintiff on behalf of Ideanomics has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

259.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

260.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ideanomics.

261.    The Individual Defendants either benefitted financially from the improper conduct, or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Ideanomics that was tied to the performance or artificially inflated valuation of Ideanomics, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

262.    Plaintiff, as a shareholder and a representative of Ideanomics, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

263.    Plaintiff on behalf of Ideanomics has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

264.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

265.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ideanomics, for which they are legally responsible.

266.    As a direct and proximate result of the Individual Defendants' abuse of control, Ideanomics has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Ideanomics has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

267.    Plaintiff on behalf of Ideanomics has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

268.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

269.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ideanomics in a manner consistent with the operations of a publicly-held corporation.

270.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ideanomics has sustained and will continue to sustain significant damages.

271.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

272.     Plaintiff on behalf of Ideanomics has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

273.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

274.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

275.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

276.     Plaintiff on behalf of Ideanomics has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Ideanomics, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Ideanomics;

(c)     Determining and awarding to Ideanomics the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Ideanomics and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ideanomics and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Ideanomics to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Ideanomics restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: July 10, 2020                                   Respectfully submitted,

                                                       **THE BROWN LAW FIRM, P.C.**

83

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

## <u>VERIFICATION</u>

I,    Ali Toorani         am         a plaintiff   the         within    action.  I have   reviewed   the   allegations   made   in   this   shareholder   derivative complaint,  know  the   contents  thereof,   and   authorize   its   filing.   To  those allegations   of which   I have   personal knowledge, I believe  those allegations  to  be true.  As  to  those allegations  of which  I  do  not have  personal knowledge, I rely upon my  counsel  and  their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2020.

7/10/2020

DocuSigned by:

*Ali Toorani*

6E6C6CF27B39499...           _____

Ali Toorani